# Rhodes *et al. versus* Dunbar *et al.*

1. That a building alleged to be a nuisance would prevent the use of the neighboring ground "for such buildings as in the ordinary course of affairs and the extension of the city would be put up," is a question for the authorities of the city or the legislature to determine, not for the courts.

2. The courts deal with people's *rights*, not with questions of mere policy, local or general.

3. The courts have power to restrain the erection of any building intended for a purpose which will be a nuisance *per se*.

4. The courts have power to restrain noises which disturb rest and prevent sleep.

5. Irreparable injury is the foundation for intervention by injunction : not irreparable because so small that it may not be estimated, but because likely to be so great as to be incapable of compensation in damages.

6. There must be injury and damage both to justify injunction.

7. If the injury be doubtful, eventual or contingent, equity will not enjoin.

8. Mere diminution in the value of property without irreparable mischief, will not furnish foundation for equitable relief.

9. It is no ground for equitable relief, that the erection of a building will increase the rates of insurance to neighboring buildings.

10. If the business be lawful and carried on reasonably and does not affect the health, comfort or ordinary uses and enjoyment of neighboring property, it cannot be a nuisance in fact or in anticipation, and the courts cannot interfere with it.

February 18th 1868.    Before THOMPSON, C. J., STRONG, AGNEW and SHARSWOOD, JJ.    READ, J., at Nisi Prius.

Certificate from Nisi Prius : In Equity : No. 14, to July Term 1866.

This was a bill in equity by William A. Rhodes and thirteen others against Elon Dunbar, John D. Jones, John H. Dunbar and Edward Clemens.

The bill set out that the plaintiffs were owners of houses and lots on Chestnut street between Twentieth and Twenty-first streets, Philadelphia, that John D. Jones, one of the defendants, had owned a planing-mill on Twenty-first street near Chestnut street, that "the character of the work done in said mill, and the mode in which it is worked, renders it entirely unsuited to a neighborhood closely built up, and especially to one occupied by handsome buildings used as residences, and it is calculated to prevent the use of the neighboring ground for such buildings as would in the ordinary course of affairs and the extension of the city in that direction, be put up there ;" that the work done in it was planing boards by steam power, that it necessarily produced a very large quantity of shavings, chips and saw-dust ; that the material used was of a most inflammable character, and rendered it dangerous to buildings in the vicinity ; that the refuse matter was used to generate steam, and produced large quantities of smoke and soot which spread over the neighboring buildings, causing discomfort and annoyance to the neighborhood and interfering with the wash-

[Rhodes v. Dunbar.]

ing of clothes; that the running of the machinery produced loud and offensive noises, which created a positive nuisance to the plaintiffs and other persons in the neighborhood, and was injurious to improvements suitable for that locality; that the building was burned in May 1866, injuring many houses in the neighborhood, and that the defendants, as plaintiffs were informed and believed, were about to rebuild the mill for the same or similar purposes; the bill charged that all the above injurious consequences would ensue if the design should be carried out.

They prayed for an injunction restraining the defendants from erecting such mill, or, if that should not be granted, for an injunction restraining them from using the building which might be "erected, in the manufacture of lumber, or in the sawing, planing, tongueing or grooving of such material, or in any similar way; and from employing it in any use or for any purpose which shall be productive of noise, dirt, smoke, soot, which shall be annoying, or injurious, or offensive to the plaintiffs or to the persons residing or owning property in the neighborhood; or in any business which renders the building hazardous, and liable to fire to an extent that will be hazardous to the buildings in the vicinity."

On motion for special injunction, Read, J., delivered the following opinion:—

"A glass-house, a chandler-shop, a swine-yard, a pig-sty, a pig boarding-house, a soap-factory, a tallow-furnace, a slaughter-house, a bone-boiling establishment, a horse-boiling establishment, a mill-dam, a melting-house of animal fat and tallow, a cotton-press, finishing steam-boilers, the use of a public place for immigrants, brick-burning, laying up wet jute, storing wood-naphtha, gunpowder, petroleum or nitro-glycerine, a lime-kiln, a dye-house, a furnace, a smelting-house, a smith-forge, a livery-stable, a tannery, gas-works—all are or have been declared nuisances. Some are nuisances *per se*, others are nuisances according to the locality in which they are placed. In offensive trades either smell or noise may create a nuisance. In dangerous trades the imminent risk of fire or explosion may be sufficient.

"Carrying on an offensive trade for twenty years in a place remote from buildings and public roads does not entitle the owner to continue it in the same place after houses have been built and roads laid out in the neighborhood, to the occupants of which, and travellers upon which, it is a nuisance: Commonwealth v. Upton, 6 Gray 473. As the city extends such nuisances should be removed to the vacant grounds beyond the immediate neighborhood of the residences of the citizens. This, public policy, as well as the health and comfort of the population of the city, demand: Brady v. Weeks, 3 Barbour S. C. R. 159. And in 4 Wisconsin 387, Douglass v. The State, it was held that it is no

[Rhodes *v.* Dunbar.]

defence to an indictment for maintaining a nuisance by means of a mill-dam, that it was erected before any inhabitants had settled along the margin of the stream flowed by it. 'There is no such thing as a prescriptive right or any other right to maintain a public nuisance:' 1 Denio 524. 'Nor does the law recognise any distinction between the several points of a city dedicated to public use.' 'If the one that is before you is sanctioned, a man will have a perfect right to open another opposite this court-house:' Per Sergeant, J., Brightly's N. P. Rep. 74.

"These principles are applicable in their most stringent form to the great cities of Boston, New York, Philadelphia and Baltimore on the Atlantic, and enjoying the inestimable benefit of a pure atmosphere, clear from smoke by the use of the anthracite coal of this state. These cities have increased, extended and spread beyond all example, and our own, now covering 129 square miles, is not the least wonderful of the four. The city proper, from 1682 to 1854, according to Holmes's plan, extended one mile on each river, and two miles from river to river, covering about two square miles, being nearly double the size of the city of London.

"By the charter of 1701, the ends of the streets extending into the Delaware were made free for the use and service of the city, but the same privilege was not extended to the ends of the streets extending into the river Schuylkill until the year 1805. Market, or High street, occupied the centre, from east to west, was 100 feet wide, and was crossed by another wide avenue, from north to south—by Broad, or Fourteenth street. The first principal street north of Market is Mulberry, now Arch street, 66 feet wide, and the corresponding one south is Chestnut street, 50 feet wide, and 484 feet south of Market street.

"The ordinary square between the north and south streets is 396 feet, but the square between Twentieth and Twenty-first streets is 495 feet. The ordinary streets are 50 feet wide, but Front street on the Delaware, and Twenty-second on the Schuylkill, are 60 feet streets. The square between Twenty-second street and Asheton, or Twenty-third street, is 272 feet, and between it and Beach street or Twenty-fourth street only 240 feet. Aspen street runs midway from Lombard to Barker street, between Twenty-first and Twenty-second streets, and 25 feet 6 inches north of Chestnut street widens, according to one plan, 28 feet, and according to the plan in the surveyor's office to 36 feet, and this portion on a city map by William Allen, in 1830, was called Aspen's court. The square on Chestnut street, from Twentieth to Twenty-first streets, is filled with new and substantial dwelling-houses on the north side, built in the modern style, and are admirable specimens of house architecture. The

south side is nearly filled up and the row extends to Twenty-first street.

"The corresponding square, on Walnut street, on the north side, is built up in the same way, my brother Strong occupying No. 2043, whilst on the south side are some costly edifices, and that portion will be soon filled up in a corresponding manner. The north side of Walnut street, between Twenty-first and Twenty-second, has a row of dwellings erecting, terminating at Twenty-second street. On the north side of Arch street the dwellings are extended to Twenty-second street. On the south side, the dwellings extend to Twentieth street, the two last being very large. From Twentieth to Twenty-first streets, there are two rows of beautiful houses, separated by a screw-bolt factory, which would be removed if the proprietors were obliged to occupy 2036, instead of their present quiet and retired residence.

"The improvement on Arch street is stopped by a great public nuisance, the gas-works, which, I suppose, the city could dispense with, as the works at Point Breeze must be sufficient. Market street is devoted to stores and to business, but on each side, certainly west of Broad street, Arch street and Chestnut street are, and should be, devoted to private residences. In the old city the current has been steadily westward on both these streets—retail stores, then wholesale stores, occupying their eastern portion. My recollection extends back sixty years, when Chestnut street was not paved between Seventh and Eighth, and the south-west corner of Seventh and Chestnut streets was a hill 15 feet high, with an old wooden house on it, and the north side of Chestnut street, up to Mr. Fitzimons' house, afterwards Pepper's, with one exception, was in a similar state. Judge Sergeant in Commonwealth v. Alburger, 1 Wharton 486, has described the various uses to which the city squares were put before they became ornaments to the city and places of recreation for its citizens. Washington Square was a horse-market and potter's field; Logan Square was a potter's field, and the hanging-place of John Joyce and Peter Matthias, for a cold-blooded murder of an old woman. Markoe's lot, at Tenth and Chestnut streets, was a skating-ground in winter and a shinny-ground in summer. Brick-kiln ponds are now covered with noble dwellings, and the executors of Stephen Girard, thirty-four years ago, burnt the bricks on the ground between Eleventh and Twelfth on Chestnut street with which the Girard houses were erected.

"The old engine-house on Chestnut street, afterwards used as a china factory, disappeared years ago, a magnificent bridge, connecting East and West Chestnut street will be opened in a few days, and East Chestnut will be filled with dwellings to the water's edge, unless stopped by existing obstructions. On the south side of Chestnut street is the depot of the Philadelphia City Passen-

ger Railway Company, which is to be removed over Schuylkill, and may therefore be considered as gone; the lot on north side of Chestnut street west of Aspen street is a stone yard, and of course both sides will be, or are, ready to receive first-rate dwellings. There only remains the half square east of Aspen street and south of Barker street. This street is 25 feet wide and the north lot on Market street is 125 feet deep, making 150 feet and leaving 344 feet between Barker street and Chestnut street. Of this space, including the alley, the ten houses of Dr. Stewart represent 80 feet, and the Jones lot, on which the planing-mill stood, 123 feet 9 inches, making 203 feet 9 inches. If this planing-mill is rebuilt, and is not destroyed by fire, it will form a permanent obstruction to the improvement of this part of Chestnut street, and, of course, reduce the value of the surrounding property, which must depend upon its fitness for dwelling-houses of a superior kind. But this leaves still the question, Is a steam planing-mill, with its steam-engine and its machinery, its chips and shavings and surrounding lumber, and its lumber in the process of manufacture and manufactured, with the refuse chips and shavings used as fuel, a public or a private nuisance? If it is either, are all or any of these parties entitled to the injunction asked for?

"The first planing-machine or mill was, I believe, erected on Arch and Broad streets, and opposite the Arch street prison. They have disappeared, and Arch street, from Broad to the Schuylkill, is a magnificent street, covered with beautiful dwellings and churches. In the face of these improvements, the planing-mill moved to a more congenial neighborhood. I don't believe Judge Sergeant would have thought that the Fifteenth street planing-mill, with its unceasing whirr and noise of the machinery, should have been permitted to be opened opposite the court-house, any more than the pig-sty he so emphatically eschewed.

"It is established beyond all doubts, that the neighbors were greatly annoyed by the soot, smoke and dust from the mill, the fuel used being the refuse wood, shavings and chips of the mill. This is proved distinctly by Dr. Stewart, Mr. Rhodes, and Mr. Jeanes, who specifies also the danger from cinders or sparks, which are also testified to by Messrs. Nathans, Dickey and Coffin; and Mr. Hoxie testified to constant complaints of annoyance from soot and cinders of the mill, by all sorts of persons in the neighborhood, his own family and nearly every neighbor; by Mr. Josiah B. Thompson, who says: 'There has been constant annoyance to myself and family from the soot, smoke and cinders from the mill. This has been incessant, entering through every window when opened, covering the window-sills when shut, and covering the steps and pavement. It has greatly interfered with

[Rhodes v. Dunbar.]

the washing and drying of clothes. This nuisance has been a constant and general subject of complaint among the neighbors.' Mr. Berry the hotel-keeper gives similar testimony, and it is closed by a long list of neighbors, certifying to the same or similar facts.

"I cannot, therefore, hesitate to believe that from the causes assigned, the neighbors have suffered from this mill such annoyances and discomforts as cannot be permitted in the built-up and improved parts of our city, and that it must necessarily affect also the value of property in the neighborhood, and if rebuilt, prevent its future improvement by buildings suited to the street and locality.

"The same witnesses prove the hazardous nature of the business in regard to fire, not only with regard to the mill itself, but the neighboring properties. The mill, it appears, has been on fire several times, and was burnt to the ground on the morning of the 1st of May last, injuring some of the adjoining houses, and there can be little doubt that if it had taken place at night, with a strong north-west wind, it would have caused a large destruction of property, with probable loss of life.

"There is, however, positive testimony as to the hazardous and dangerous character of such a planing-mill in a built-up and improving part of the city. Mr. Blackburn, our experienced and able fire marshal, with a practical experience of nearly sixteen years in matters connected with fire, in his affidavit, says :—

"'As far as my knowledge and experience go, I regard planing-mills, sawing-mills, and establishments worked by steam, in which lumber is worked into planed boards, sashes, mouldings, doors and the like, as among the most hazardous of all risks. The accumulation of a large body of worked and unworked lumber, shavings, chips and bits of wood, necessarily makes this the case. I regard the destruction of such establishments, where the fuel used in making the fires is from the refuse wood, chips and shavings, as a mere question of time. Sooner or later they are almost invariably burnt. In confirmation of this, I will give particular instances.' He then gives three cases in which the mills were burnt down twice, and nine others in which they were entirely burnt down once, except in one instance where the building was badly damaged twice. In one case there was a loss of over a quarter million of dollars, and the cause of the conflagration was the ignition of a lot of refuse wood and stuff in front of one of the furnaces.

"He then says : 'I think I could give from my records a hundred instances of such establishments which have been more or less injured by fire, many of them totally destroyed.'

"'I regard a planing-mill or any establishment of the kind as entirely unsuited to a densely-built portion of the city, as there is

[Rhodes *v.* Dunbar.]

always very great risk of conflagration to itself and the adjoining buildings, and necessarily great hazard to property in the neighborhood, *and danger of loss of life*, especially when the fire occurs in the night time.' ·

" ' When Murphy & Allison's car establishment was burned, their watchman was so severely injured by the fire as to cause his death in a few hours afterwards.'

" Mr. Nathan H. Wood, who rented a room in the mill, speaks of the complaints of neighbors and threats of prosecution, of the number of times it was on fire, and says, ' In my opinion, and from my experience I think there is no kind of factory, except that for the making of gunpowder, more hazardous or liable to fire.' He then mentions a fire-proof planing-mill in New York which took fire during the day, in the absence of the engineer for a few minutes, and was destroyed.

" ' The flames,' says Mr. Jeanes, ' extended forty or fifty feet above the hotel, at the corner, which is a four-story building.' Mr. William Green, who has been surveyor of the Franklin Fire Insurance Company for upwards of twenty years, says, ' So far as my experience goes, which is considerable, I regard planing-mills as the most hazardous of all risks, after gunpowder-mills and petroleum establishments. I do not see how it is possible to erect and run such a mill without great danger of loss by fire. As evidence of this my experience is, that all such establishments are almost always burnt down. It is merely a question of time.'

" ' If the wind had been blowing strongly from the north-west, and the fire had taken place at a late hour of the night, on the occasion of Jones's planing-mill being burned, I think there would have been imminent danger of fire to all the houses on both sides of Chestnut street between Twenty-first and Twentieth streets.'

" ' 5. I am strongly of opinion that no such establishment should be allowed in the built parts of the city or in a neighborhood like that in which Jones's planing-mill recently stood.'

" ' 6. I have read Mr. Blackburn's affidavit and concur fully with what he says in it.'

" The affidavit of Walter Allison, one of our most experienced builders, and whose shop was next to the mill, is conclusive on the point of danger :—

" ' 2. I consider such a mill as this,' says he, ' and all similar establishments extremely dangerous in the built-up parts of the city, by reason of the risk from fire, and have known several such mills to be burned down.'

" ' 3. In my opinion I think no such establishments should be permitted to be located in built-up portions of the city. I have already expressed myself to this effect, saying that they were little better than powder magazines. It is almost utterly impossible to put them out when once fairly on fire. On the occasion of

[Rhodes *v.* Dunbar.]

the mill burning down in May last, the heat was so intense that my men were unable to remove the frames, doors and sashes under my shed in my yard. The heat was so intense that the glass in the sashing was melted into lumps.'

" ' 4. I do not believe it would be a great disadvantage to lumbermen and builders if such mills were located in unbuilt portions of the city. In my judgment all such establishments should be located away from built-up portions of the city. Had that fire occurred at night, with a strong wind blowing, there would have been not only very great danger to all the property in the neighborhood, but very great peril to the lives of the persons dwelling near the mill. There is danger from explosion of the engineboilers as well as danger of fire.'

" After this evidence, is it necessary for me to discuss the question, whether such a mill is a public or a private nuisance ? It is a nuisance, and the plaintiffs are entitled to relief because, no matter what improvements may be introduced, the building proposed to be erected must be a nuisance, and I should regard myself as derelict if I did not interpose the strong arm of the law to prevent it.

" I pass over the minor injuries to property by increased rates of insurance, because there stands out in broad relief the imminent danger to the lives and property of our fellow-citizens.

" In England, wood naphtha and wet jute are nuisances, and so I should consider petroleum if brought into the built parts of the city. We have had one dreadful example of this, when buildings were burned and the gutters ran living fire, preventing the escape and destroying the lives of helpless women and children.

" Fire is the most dreadful infliction of the present time. You can hardly open a newspaper without meeting the account of some terrible conflagration attended with immense loss of property and great sacrifice of human life. It is, therefore, our duty to narrow the circle of danger by forbidding erections which must certainly be destroyed by the inherent vices of their constitutions.

" The late English decisions correspond with the increasing civilization of the age. In Reg. *v.* Lister, 3 Jur. N. S. 571 (May 30th 1857), the Court of Criminal Appeal, composed of twelve of the fifteen law judges, including the three chiefs of the three superior courts of law, held that keeping in a warehouse near to divers streets and dwelling-houses divers large and excessive quantities of a dangerous, ignitable and explosive fluid, called ' wood naphtha,' was a nuisance, and indictable as such. The jury found, if ignited, water could not put out the fire, except where water was applied in enormous quantities; and they also found that it was the practice never to allow any candles, or fire, or gaslight to enter the warehouse, and so long as that continued the naphtha would not produce danger.

[Rhodes *v.* Dunbar.]

" So of wet jute, a substance resembling hemp, deposited on an open lot, it being proved that it had been the occasion of large and destructive fires in London, and the very lot of jute itself had been saved from such a fire as a damaged article: 11 Jur. N. S. p. 132. So gunpowder, stored by grocers and others, which the unscientific portion of the community always believed was the cause of the explosions and extension of the great fire on the eastern front of the city in 1850; and it was then asserted that if the fire had extended a block further, it would have reached a store where several barrels of gunpowder were stored contrary to law. So in Bamford *v.* Turnley, in the Exchequer Chamber, 9 Jur. N. S. 377, it was held, where a man burns bricks on his own land, so as to annoy his neighbor in the enjoyment of his house, he cannot excuse the act by showing that it was done in a proper and convenient place, and was a reasonable use of the land. So in Cavey *v.* Lidbetter, Common Pleas, 9 Jur. N. S. 798, it was held no misdirection in the judge to refuse to leave to the jury, whether the bricks had been burnt in a proper and convenient place for that purpose. In Beardmore *v.* Tredwell, 9 Jur. N. S. 272, V.-Ch. Stuart held that where a public contractor, for furnishing bricks for fortifications, commenced burning bricks within 340 yards of the plaintiff's mansion, was a nuisance, and restrained it, and directed that the defendant should not burn any bricks within a distance of 653 yards, or 1959 feet, from the plaintiff's house.

" In The Stockport Waterworks Company *v.* Potter, 7 Jur. N. S., p. 880, carrying on a lawful trade in the ordinary and obvious manner, is not necessarily carrying it on in a proper manner.

" In The St. Helens Smelting Company *v.* Tipping, decided in the House of Lords on July 5th 1865 (12 L. J. R. N. S. 776), the smelting works were held a nuisance though a mile and a half distant. ' Of the effect of the vapors exhaling from these works upon the plaintiff's property, and the injury done to the trees and shrubs, there is abundance of evidence,' says Lord Westbury. The injury in this case was to the vegetation. In Scott *v.* Forth, 10 L. T. R. N. S. 240, Justice Blackburn, in a case where tilt-hammers shook the cottages of the plaintiff, cracked the walls, and the tenants left, the defence being that the grievances complained of were caused in the reasonable and proper exercise of his trade, in a reasonable and proper place, held that in law this was no answer to the action. The jury, probably Sheffield men, found it was not a nuisance.

" There are two articles in the last English Quarterly and Edinburgh Reviews of great interest, not only to England, but to the United States, and particularly to this state and city. The first is the 5th article, entitled ' coal and smoke,' and treats of the probable exhaustion of their coal-mines, and the effect of the bitumi-

[Rhodes *v.* Dunbar.]

nous coal-smoke on the metropolis and other cities of the kingdom, and at the same time recognising the incalculable value of the anthracite region of this great state, as found in its three great coal-fields of the Schuylkill, the Lehigh and the Wyoming or Susquehanna—all connected by water and rail with this city. It is instructive to read the effects of coal-smoke on the atmosphere of London. It reminds us of some localities in the West. 'And not only,' says the reviewer, 'do our hands and faces contract dirt, but soot finds its way into the air-tubes of our lungs. Plants as well as animals are poisoned by smoke, and see. 'how they struggle for existence in the parks of London. The fine trees in Kensington Garden are dying apace, and roses bloom not within some miles of Charing Cross. *Then how great oppression falls on our spirits from the fuliginous exclusion of the pure light of the sun!'* Poor Mr. Peabody, according to this authority, as a reward for his magnificent charity, will have 'a thing we call a statue, which, though consisting of bronze, is blackened with soot—an effect which, it is reported, an eminent deceased sculptor admired as they were thus boldly relieved against the sky.'

"The second article is the third series in the Edinburgh, headed 'Water Supply,' which points out the present inadequate supply, and the necessity of resorting to the mountains of Wales for pure water.

"We can never be sufficiently grateful to our great founder, William Penn, for the selection of the site of this City of Brotherly Love on the banks of two fresh-water streams, which, when the Schuylkill is exhausted, can be supplied by the inexhaustible Delaware from above the Falls of Trenton. With these natural advantages we have the coal and iron side by side, and the best and most secure position for a great navy-yard in the world.

"One of the scientific witnesses has been unfortunate in the selection of the screw-bolt factory on Arch street, with its triphammers, for the owner of No. 2036 could soon teach him the law on this question, and Esler's planing-mill is only saved by being in the rear of the Church of the Epiphany, and separated by a small street being on the Market street portion of the block, and with similar mechanical trades near it.

"If either of these factories were opposite this court-house, it would not require a judge to tell us they were public nuisances.

"The case of Elmhirst *v.* Spencer, 2 Mac. & G. 45 (Dec. 6th 1849), is no longer law in England, since the alteration in the Court of Chancery by the Chancery Amendment Act, as stated in Goldsmid *v.* Tunbridge Wells Improvement Commissioners, 14 L. T. R. N. S. 154, decided by the Lords Justices on the 24th of March 1866—and certainly on a motion for a preliminary injunction would not be applicable here : Sunbury and Erie Railroad Co.

[Rhodes *v.* Dunbar.]

*v.* Cooper, 9 Casey 280; Holsman *v.* Boiling Spring Bleaching Company, 1 McC. N. J. Ch. 135.

"This court is both a court of law and equity, and the judge is therefore entirely competent to decide all questions of law, and upon the equity side of fact—unless he desires to have the assistance of a jury, which is clearly not required in this case."

On the 16th of June 1866, a special injunction was granted.

The defendants then put in separate answers.

Jones answered, averring, amongst other things, that his mill, from the kind and manner of work, was not unsuited to the neighborhood, or more undesirable than other manufactories, and that it was not calculated to prevent the erection of suitable buildings in the neighborhood; that the risk of fire was less than from many carpenter shops, cotton factories, &c., and the like, in other built-up parts of the city; the smoke and soot might be prevented from annoying the neighbors by suitable appliances. He then averred, that before the burning of the mill he had agreed with the defendants, Clemens and John H. Dunbar, to introduce improvements into the mill, but owing to the fire, he had sold the lot to them, and agreed to erect for them a new mill, which would be built in a secure manner (describing it), "with every precaution against fire that practical ingenuity can suggest," with such appliances to carry off smoke and soot as would occasion no nuisance to the neighborhood, and that the noises would be far less than many places of business in the city.

J. H. Dunbar and Clemens answered, averring the agreement to improve the mill, the subsequent purchase of the lot by them, and agreement for building set out in Jones's answer; also, that expensive arrangements for rebuilding had been made. They also set out the character of the building, its security as to fire, &c., as averred in Jones's answer.

Elon Dunbar answered, that he had no interest in the property or business except as a creditor of J. H. Dunbar and Clemens for money loaned to them. He made substantially the same averments as Jones.

The plaintiffs put in a general replication.

The matter was referred to Samuel C. Perkins, Esq., as examiner and master, who took and reported a large amount of testimony as examiner. He concludes an able report as master, as follows:—

"The master is of opinion that the steam planing-mill could hardly, in the common course of things, be used without working mischief to the property of the plaintiffs and other property in the neighborhood—by causing annoyance, inconvenience and discomfort; by exposing such property to the risk of destruction or damage by fire; and by depreciating its value, and hindering

[Rhodes v. Dunbar.]

improvements of a class suited to, and such as would naturally seek that locality.

" That other manufacturing establishments and operations of the same or other kinds, not less, or even more dangerous or offensive, are carried on in other parts of this and other cities, affords no excuse. Each case must be decided by itself, under all the circumstances of time, locality, surroundings and the whole nature of the thing.

" Upon the whole case, therefore, the master is of opinion, and so reports to the court, that the plaintiffs are entitled to the relief prayed for. He therefore reports that the injunction as decreed should be made perpetual."

On the final hearing, upon exceptions of the defendants to the master's report, the injunction was made perpetual, and the defendants directed to pay the costs.

The defendants appealed and assigned for error the decree at Nisi Prius.

G. L. Crawford and W. A. Porter, for appellants, cited Carpenter v. Cummings, 2 Phil. Rep. 74; Com. Dig., Action on Case for a Nuisance (C); Hole v. Barlow, 4 C. B. N. S. 334 (E. C. L. R. vol. 93); Bamford v. Turnley, 3 B. & S. 62 (E. C. L. R. R. vol. 113); Cavey v. Ledbitter, 13 C. B. N. S. 470 (E. C. L. R. vol. 106; Tipping v. St. Helen's Smelting Co., 4 B. & S. 608 (E. C. L. R. vol. 116), 11 Jurist N. S. 785; Crump v. Lambert, Law Rep. 3 Eq. 409 (1867); Kirkham v. Handy, 11 Humph. 406; Bell v. Ohio and Penna. Railroad Co., 1 Casey 161–175, 176, 177, 182; Hilliard on Injunction, p. 27, § 2; Earl of Ripon v. Hobart, 3 M. & K. 169; Elmhirst v. Spencer, 2 Mac. & G. 50; Coe v. Lake Co., 37 N. H. 254; Kirkham v. Handy, 11 Hump. 406; Rogers v. Danforth, 1 Stock. 289; Butler v. Rogers, Id. 487; Grey v. Ohio and Penna. Railroad Co., 1 Grant 412; Rhea v. Forsyth, 1 Wright 503; Sparhawk v. Union Pass. Railroad Co., 4 P. F. Smith 401; Walter v. Selfe, 4 E. L. & Eq. 15; Holsman v. Boiling Springs Co., 1 McCarter 335; Richards's Appeal (antea, p. 105).

R. C. McMurtrie and G. W. Biddle, for appellees, referred to the authorities in the opinion of Judge Read.

The opinion of the court was delivered, March 31st 1868, by

THOMPSON, C. J.—The plaintiffs by their bill seek to enjoin the defendants from re-erecting or reconstructing a planing-mill, late the property of John D. Jones, situate on the west side of Twenty-first street, between Chestnut and Market streets, which was destroyed by fire in the month of May 1867. It is claimed, that if re-erected it will be a nuisance to the property and dwellings

[Rhodes *v.* Dunbar.]

of the complainants, impairing their value, and rendering the enjoyment of them uncomfortable and unsafe; and this, it is alleged, will flow from three causes, incident to the structure, and its intended use if it be permitted to go into operation, viz.: 1st. smoke, soot and dust; 2d, noise; and 3d, danger from fire. The very general averment in the bill that the mode in which such a factory or mill is worked renders it unsuited to a neighborhood closely built up, and especially to one occupied by handsome buildings used as residences, and will be calculated to prevent the use of the neighboring ground "for such buildings as would in the ordinary course of affairs, and the extension of the city in that direction, be put up," presents for consideration a subject not within our sphere of judicial action. It presents a question of policy whether a part or portion of a city ought to be devoted exclusively to private residences or other special objects; and that is manifestly for the local authorities or the legislature to determine, and not us. That concerns alone the public, and not private parties. With peoples' *rights* we deal in cases like the present, and not with questions of mere policy, local or general.

No one will for a moment doubt that we are invested with ample powers to restrain the erection of any building or structure intended for a purpose which will be a nuisance *per se;* such as bone-boiling, horse-boiling establishments, swine-yards, or pig-styes, and other various like establishments. These not only interfere with the health, but, if they do not reach to that, they do to the usual and ordinary enjoyment of the residences of inhabitants coming within the circle of atmosphere tainted by them, and both property and persons may be prejudiced or injured thereby. The right to claim that such establishments shall be prevented, is the right that every citizen has to pure and wholesome air, at least as pure as it may be, consistent with the compact nature of the community in which he lives. The rule is the same in regard to noises which disturb rest and prevent sleep. There are innumerable cases of injunction for such causes.

But does the case in hand come within the classes to which reference has been made in either of the specifications mentioned?

1st. The smoke and soot complained of—I do not think have been shown to have been a nuisance in the old mill, for which damages at law might have been recovered; and I know of no other criterion where the complaint is for injury to property and its enjoyment. Irreparable injury is the foundation for intervention by injunction: not irreparable because so small that it may not be estimated, but because likely to be so great as to be incapable of compensation in damages: Hilliard on Inj. 270, 271, 272: 37 N. H. Rep. 254. There must be injury and damage both to justify the remedy by injunction: Campbell *v.* Scott, 11 Sim. 39. The complaint of the old mill in this particular was, on account mainly

[Rhodes *v.* Dunbar.]

of the fuel; chips, shavings and sawdust used—that is the foundation of the complaint against the contemplated re-erection. If no other species of fuel would answer the purpose, or could be used, I grant there might be more in the point. But this is not pretended. If, therefore, when the mill shall be put into operation and by its use it becomes a nuisance from this cause, the remedy is easy, and well known. Equity will enjoin against the use of such fuel, and the mischief will be at once cured.

That a thing may possibly work injury to somebody is no ground for injunction. If the injury be doubtful, eventual or contingent, equity will not interfere by injunction: Butler *v.* Rogers, 1 Stockt. (N. J.) 487, Hilliard 271. This might be sufficient on this point, but it is quite possible that in the construction of chimneys all objection to this kind of fuel may be obviated. The answer of one of the defendants asserts this, and that it is intended and can be accomplished, and it is nowhere controverted. Indeed it seems evident that if the chimneys be built high enough with proper nettings at the top, that anything like annoyance amounting to a "sensible injury" to property, as was held to be essential to enjoining in Tipping *v.* St. Helens Smelting Co., 116 E. C. L. R. 608, may be entirely avoided. Indeed the learned master seemed in doubt whether the element of smoke, soot and cinders, judged of by the old mill, proved or would prove a material injury to property. Alluding to these agencies, he says they "perhaps cannot in a strict sense be said to have produced a material—that is, a palpable, direct, physical injury to the plaintiff's property." But then he gives reasons to show that it occasioned annoyance and discomfort, and therefore concluded that a re-erection of the mill ought to be prevented for this and other reasons. Annoyances without damage, I have already said, are no ground for injunction. Shall the owner of property be deprived of its free and profitable use, altogether, it may be, because the light and air may not be as pure as a neighbor might desire, or because a laundress may not be able to dry the contents of the washtub quite as satisfactorily, or a housemaid have to dust more frequently? These are annoyances referred to in the proof, but are incident to a city residence, and if people prefer living in a city, they can only do so because of others desiring to do the same thing in sufficient numbers to constitute a city, and then each tacitly undertakes to suffer such annoyances or inconveniences as are incident to that kind of community. This has been often expressed, but is strikingly enforced by Lord Chancellor Westbury, in Tipping *v.* St. Helens Smelting Co., *supra.* "If a man," said the Chancellor, "lives in a town, of necessity he should submit himself to the consequences of the obligations of trades which may be carried on in his immediate neighborhood, which are actually necessary for trade and commerce, also for the enjoyment of property, and for the benefit of

[Rhodes *v.* Dunbar.]

the inhabitants of the town.   If a man live in a street where there are numerous shops, and a shop is opened next door to him which is carried on in a fair and reasonable way, he has no ground for complaint because to himself individually there may arise much discomfort from the trade carried on in that shop."   Lord Cranworth in the same case puts it thus: "You must look at it, not with a view to the question whether abstractedly that quantity of smoke was a nuisance, but whether it was a nuisance to the person living in the town."   We endeavored to express something like this in Sparhawk *v.* Union Passenger Railway, 4 P. F. Smith 401. It must be apparent to all, we think, that the circumstances here do not establish a nuisance *per se*, and in regard to the intended structure, if it ever amounts to this, from the causes alleged in regard to the fuel, it is within the powers of the court to redress the injury by restraining the use of the objectionable fuel.   It may be that none such may be used, or if used, that there may be an adaptation of structure to prevent injurious consequences and annoyances.   Neither the facts nor precedents would, we think, justify us in restraining the re-erection of the building on this ground. We are therefore constrained to differ from our brother who sustained the master on this point as well as on another at Nisi Prius.

2. Noise—It is enough to say here, that the master was of opinion, and so found, that this "was not sufficiently established to afford a ground of relief to the plaintiffs."   This conclusion was not much controverted in the argument before us, and we think the master was right in his conclusions on this point.

3. Danger, or apprehension of danger from fire, is the last point to be noticed, and this seems to have been really the main ground of decision in the mind of the master, as well as of our learned brother, in awarding an injunction.

What is apprehension?   It is anticipation of danger, not a certainty that it will occur.   It may be felt as well when danger is infinitely remote as when it is near, as well when it may never occur as when it may.   It is in regard to fire, "speculative, eventual and contingent," and the books say this is never a ground for interference by injunction: Earl of Ripon *v.* Hobart, 3 Mylne & Keene 169.   The apprehension of danger must, on the theory of this case at least, be very remote, viz.: that the mill when erected may take fire by negligence, accident or by the work of an incendiary; that the fire may not be extinguished— and that it may be communicated to, and burn the property of the plaintiffs and endanger their lives.   Every element in all this is "speculative, contingent and eventual."   The mill might take fire, but the flames may be extinguished; and it might be burned down without destroying the property of anybody else.   It would be a waste of time I think to labor to prove what every one must assent to, that this as a ground to exercise the power to prevent

[Rhodes v. Dunbar.]

the occupation and enjoyment of property, would be extremely intangible, and once established as to this kind of mill, might be applied to every other building or business in community, described in fire risks, or known as extra-hazardous, and not only planing-mills, but chemical laboratories, carpenter shops, cotton-mills, barns, stables, in short everything that there might be ground to apprehend danger of fire from, would gradually fall into the vortex of chancery power, and might be banished the city altogether, to the great inconvenience of the people. There is danger in all such establishments, it is true, and the same argument would apply to many others. The degree of danger would be the only difference.

In Anonymous, 3 Atk. 750, Lord Hardwicke said: "Bills to restrain nuisances, must extend only to such as are *nuisances at law*, and the *fears of mankind, though they be reasonable*, will not create a nuisance." That rule was held and acquiesced in, in the case of Carpenter v. Cummings, 3 Philada. Rep. 74. That was a bill to restrain the defendant from maintaining a boiler to propel steam machinery under the pavement of a public street and thoroughfare. The nuisance charged was the fear of danger to the complainant and others, that it might explode and destroy their property and lives. The injunction was refused on the authority of the case mentioned above, citing also 18 Paige 219, and was, it would appear, acquiesced in by the parties and counsel. Butler v. Rogers, 1 Stockt. 487, was an attempt to restrain a blacksmith shop. Williamson, Ch., said, "As a general rule the court ought not to interfere in cases of nuisances, where the injury apprehended is of a character to justify conflicting opinions, whether the danger will in fact be ever realized."

If it be true that the act complained of must be a nuisance at law, as held in 3 Atk. 750, *supra*, and sanctioned in Sparhawk v. The Union Passenger Railway Co., *supra*, this test would settle the controversy in this case at once. No action can be found, I think, in which mere apprehension from the use of property by one has been held a ground to recover damages by another, on the possibility of fire being communicated by the former to the property of the latter.

But it is said that the rate of insurance upon the plaintiffs' property will be increased as a consequence of the re-erection of this mill. If this fact had been found by the master, it would not have established the point of nuisance. It is well known that the existence of extra-hazardous property in a neighborhood, while it draws upon itself a heavier burthen or rate of insurance, does not usually constitute special rates in regard to proximate property belonging to a class with fixed rates. But it is stated very distinctly in Story's Equity Jurisprudence, § 925, that mere dimi-

7 P. F. SMITH—19

[Rhodes *v.* Dunbar.]

nution in the value of property, without irreparable mischief, will not furnish any foundation for equitable relief.

In Attorney-General *v.* Nichols, 16 Ves. 337, which was an application for an injunction against darkening ancient lights, Lord Eldon said, " The foundation of this jurisdiction, interfering by injunction, is, that head of mischief alluded to by Lord Hardwicke (in Fishmongers' Co. *v.* East India Co., 1 Dick. 164), that sort of material injury to the comfort of the existence of those who dwell in the neighboring houses, requiring the application of a power to prevent as well as to remedy an evil for which damages, more or less, would be given in an action at law. I repeat the observation of Lord Hardwicke that the diminution of the value of the premises is not a ground." That is to say, the mere diminution, irrespective of any direct damage, is not a ground for injunction. On this principle the diminution, by reason of increase of insurance, if it really exists, is no ground for the interference sought.

Grant that the species of property in question is extra-hazardous; is subject to fires; this, on the authority of all the cases, would not render it a nuisance. It does not necessarily affect health, comfort or the ordinary uses and enjoyment of property in the neighborhood. If the business be lawful, and carried on reasonably, and does not interfere in either of these ways with the rights of others, it cannot be a nuisance in fact or in anticipation, and, in my opinion, we have no authority whatever to interfere with it.

These observations give no just grounds to draw the inference that a powder magazine, or depot of nitro-glycerine, or other like explosive materials, might not possibly be enjoined even if not prohibited, as they usually are, by ordinance or law. It is not on the ground alone of their liability to fire, primarily or even secondarily, that they may possibly be dealt with as nuisances, but on account of their liability to explosion by contact with the smallest spark of fire, and the utter impossibility to guard against the consequences, or set bounds to the injury which, being instantaneous, extends alike to property and person within its reach. The destructiveness of these agents results from the irrepressible gases once set in motion infinitely more than from fires which might ensue as a consequence. Persons and property in the neighborhood of a burning building, let it burn ever so fiercely, in most cases have a chance of escaping injury. Not so when explosive forces instantly prostrate everything near them, as in the instances of powder, nitro-glycerine, and other chemicals of an explosive or intensely inflammable nature.

It is a difficult matter at all times to strike the true medium between the conflicting interests and tastes of people in a densely populated city. It requires the merchant, mechanic, manufac-

[Rhodes v. Dunbar.]

turer, baker, butcher and laborer, as well as the wealthy and employed or unemployed citizen, to constitute a city. They all have rights, and the only requirement of the law is, that each shall so exercise and enjoy them as to do no injury in that enjoyment to others, or the rights of others, in the sense in which the law regards injury, namely, accompanied by damage. It might be a great injury to the defendants in this case to restrain them from the enjoyment of their property, without being of any benefit to the plaintiffs. The ground claimed in argument to sustain the decree in this case was mainly the danger of fire. The proof is, that these are dangerous establishments, by comparison with others less dangerous—but there is proof that they do not always burn, and may never burn. In this state of the case, the language of Lord Brougham in The Earl of Ripon v. Hobart, is worthy a reference to here : " It is also," said his lordship, " very material to observe, what is indeed strong authority of a negative kind, that no instance can be produced of the intervention by injunction, in the case of what we have been regarding as *eventual* or *contingent* nuisances." We have said enough to indicate our opinion that the fear of fire is of this description, and that this injunction should not have been granted originally, and therefore that the decree must be reversed, and bill dismissed.

     Decree reversed and bill dismissed, at the costs of the appellees.

READ and SHARSWOOD, JJ., dissented.