Rick et al., Appellants, *v.* Cramp et ux.

Argued April 15, 1947. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Randolph Stauffer,* for appellants.

*Morgan D. Reinbold,* for appellees.

84

This is an appeal from the decree of the court below refusing to grant an injunction in response to plaintiffs' bill. Plaintiff sought to restrain the defendants from conducting the business of a funeral home, an undertaking establishment, upon defendants' premises at 934 Centre Avenue, Reading. Plaintiffs own and reside in private dwellings in the vicinity of the proposed funeral home and they aver that the district is exclusively residential and the operation of a funeral home will constitute a nuisance. The defendants filed an answer denying that the section is exclusively residential and denying that the operation of a funeral home would be a nuisance. A trial was had on Bill and Answer before Chancellor Mays. He made certain findings of fact. Among the findings are these: The defendant proposes to have his home on the second and third floors of the building and the funeral home will be on the first floor. He proposes to employ a competent landscape architect to arrange proper plantings on the grounds. Defendant does not propose to floodlight the premises. The distance from the curb of the premises at 934 Centre Avenue (this being the number of the proposed funeral home) to the building is 67 feet. The defendant conducts an average of 102 funerals per year, 15 per cent of which are held at private residences. Centre Avenue is a busy and much traveled highway. For example, on October 17, 1945, from 8:00 A. M. to 12:20 P. M., and from 1:20 P. M. to 5:00 P. M., 1452 pleasure cars, 470 trucks, 15 buses and 91 trolley cars traversed Centre Avenue. There was equally heavy traffic on other days. Noises caused by the coming and going of pleasure cars, buses, trolleys, coal and other trucks in the neighborhood were almost continuous throughout the day and night and funeral processions on Centre Avenue were almost a daily occurrence. An average of 690 funeral processions traversed Centre Avenue annually. Funerals are frequently held at St. Margaret's Roman Catholic Church, which is a

relatively short distance from one of the plaintiff's residence. The southern boundary of the Charles Evans Cemetery is approximately 150 feet away from it. The twenty-fifth finding is that "The said Charles Evans Cemetery occupies 120 acres, contains approximately 51,400 graves, and has a crematory building and a columbarium within a few blocks of the plaintiffs' residences." The Chancellor found as a fact that the presence of a funeral home will not depreciate the value of property in its immediate vicinity and that other residents in the immediate neighborhood favor the establishment of the funeral home at 934 Centre Avenue.

The Chancellor in his discussion said:

"It must be admitted that as one views Centre Avenue on both sides between Windsor and Spring Streets, it has all the appearance of being a residential section. If, however, we enlarge our view, particularly in the light of the evidence in this case, and comprehend the area bounded on the north by Robeson Street, on the east by North Fourth Street, on the south by Greenwich Street, and on the west by North Front Street, we have a section of the city that is slowly becoming commercialized. Within this area there are 151 apartment houses, 48 business places, three social clubs . . ."

The Chancellor further said:

"My inquiry here is not whether the establishment of this funeral parlor is obnoxious to this or that individual, but whether it is of such a character as to be obnoxious to mankind generally, similarly situated."

"In Westcott v. Middleton, [43 N. J. Eq. 478] 11 A. 490, Bird, V. C., said (at p. 493) : 'Before the court can condemn a trade or calling, it must appear that it cannot be carried on without working injury or hurt to another; and, as I have said, that injury or hurt must be such as would affect all reasonable persons alike similarly situated. The law does not contemplate rules for the protection of every individual wish or desire or taste.

It is not within the judicial scheme to make things pleasant or agreeable for all the citizens of the state.' "

"I must conclude that there are no grounds . . . for enjoining the operation of this funeral parlor."

The Chancellor in his adjudication said:

"The plaintiffs in this case, as I have pointed out, through the years have had daily reminders of death in that the Charles Evans Cemetery is within view, and almost daily funeral processions pass their houses. This in itself is quite significant and tends to mitigate whatever disturbance there may be from the fact that a funeral home is maintained within the territory where the large Charles Evans Cemetery is maintained, and these funeral processions to that cemetery, and to the Laureldale Cemetery, and to and from the Catholic Church, are viewed from six to seven hundred times a year."

The court reached these conclusions:

"(1) The evidence fails to show that the properties in the neighborhood will depreciate in value by reason of the presence of the proposed funeral home. (2) The evidence fails to show that a nuisance will result from the operation of the proposed funeral home. (3) The proposed funeral home and residence will not constitute a nuisance. (4) An injunction should not issue, but the bill should be held pending the defendants' placing upon the record an agreement that the sign shall not be erected upon the lawn but upon the building itself, and that the use of the entrance to the driveway at Centre Avenue shall be merely for their private purposes and not for the moving of funeral cars into or from Centre Avenue over and across the said driveway."

The question: Shall the maintenance of an undertaking establishment in a strictly residential district be enjoined as a nuisance is one in which the courts in various jurisdictions have differed. This question has never been decided by *this* court. In what appears to be a majority of jurisdictions the question has been an-

swered in the affirmative. This affirmative view is well expressed by the Supreme Court of Michigan in *Saier v. Joy,* 198 Mich. 295, 164 N. W. 507, as follows:

"The constant going and coming of the hearse . . . the not infrequent taking in and out of dead bodies; the occasional funeral with its mourners and funeral airs, held in the part of the house designed for a chapel; the unknown dead in the morgue, and the visits of relatives seeking to identify them; the thought of autopsies, of embalming; the dread, or horror, or thought, that the dead are or may be lying in the house next door, a morgue; the dread of communicable disease, not well founded, as we have seen, but nevertheless present in the mind of the normal layman—all of these are conducive to depressions of the normal person; each of these is a constant reminder of mortality. These constant reminders, this depression of mind, deprive the home of that comfort and repose to which its owner is entitled."

Views in accord with the one just quoted are expressed in the following cases: *Higgins et al. v. Bloch et al.,* 216 Ala. 153, 112 So. 739; *Harris et al. v. Sutton et al.,* 168 Ga. 565, 148 S.E. 403; *Hatcher et al. v. Hitchcock,* 129 Kan. 88, 281 Pac. 869; *Cunningham et al. v. Miller et ux.,* 178 Wis. 22, 189 N.W. 531. .

3 Cooley on Torts (4th ed.) 180, section 435, makes the following statement:

"An undertaking establishment is not a nuisance per se, and by some courts it is held that even when located in an exclusively residential district, with the result that, because of sentimental repugnance on the part of those who might reside near it, property values in the vicinity would depreciate, such establishment would not be enjoined. By what appears to be the weight of modern authority, however, it is held that the location of such a business in a residential district is sufficiently objectionable to make it a nuisance. Thus it has been stated: The inherent nature of an undertaking estab-

lishment 'is such that, if located in a residential district, it will inevitably create an atmosphere detrimental to the use and enjoyment of residence property, produce material annoyance and inconvenience to the occupants of adjacent dwellings, and render them physically uncomfortable, and in the absence of a strong showing of public necessity, its location in such a district should not be permitted over the protests of those who would be materially injured thereby.' "

In *Bragg et al. v. Ives,* 149 Va. 482, 140 S.E. 656, the Supreme Court of Virginia said:

"We agree with those decisions, however, which hold that when an undertaking establishment invades a community which has previously been strictly residential, and the character of the business, or the manner in which it is conducted, is such as will naturally depress the spirits and sensibilities of those living in close proximity to it, to the extent of weakening their power to resist disease and destroying the comfort, repose and enjoyment of their homes, making them less desirable and thereby materially depreciating their value, then such business is a nuisance to those so affected by it. It is true that the objection to the business must be something more than imaginary, or an individual aversion to the proximity of the establishment and to the thought of death superinduced by its nearness and the activities carried on in connection with it. The annoyance complained of must be something real, substantial and tangible—one that affects the normal person, not the overnervous or supersensitive, nor yet the hardened and stoical, but the ordinary man, with ordinary sensibilities, tastes and feelings. The maintenance of an undertaking establishment under circumstances that produce such a result upon such a person goes beyond mere mental disturbance—it involves the physical enjoyment and comfort of the home, with which no business, however lawful and necessary, has the right to interfere."

See also *Arthur v. Virkler,* 258 N.Y. Supp. 886, 46 C.J. 726, section 202, makes the following statement:

"An undertaking establishment or a funeral parlor is not a nuisance per se [citing cases], but by reason of surrounding circumstances it may become a nuisance. [Citing cases] It may constitute a nuisance by reason of its location [citing cases], as, for instance, under particular circumstances, when it is located in a residential district [citing cases], notwithstanding, it has been held, it does not directly affect the health or grossly offend the physical senses [citing cases]; but it has been more frequently held that the mere location in a residential district is not sufficient to make such an establishment a nuisance." (Citing cases.)

The view that an undertaking establishment in a populace place is not a nuisance is well set forth in an opinion by the Court of Chancery of New Jersey in *Westcott v. Middleton,* cited by the court below. In that case the opinion states:

"Must the undertaker retire from the inhabited parts of our villages, towns, and cities? Is an occupation which is absolutely essential to the welfare of society to be condemned by the courts, to be classified with nuisances, and to be expelled from localities where all other innocent and innoxious trades may be carried on? In other words, is this business so detestable in itself as unreasonably to interfere with the civil rights or property rights of those who dwell within ordinary limits, and who can and do, without effort, see and hear what is being done?"

The New Jersey Equity opinion cites the case of *Walter v. Selfe,* 4 Eng. Law & Eq. 15, and says:

"In this case, then, we have the broad, yet perfectly perceptible or tangible ground or principle announced, that the injury must be *physical,* as distinguished from purely *imaginative;* it must be something that produces real discomfort or annoyance through the medium of the senses, not from delicacy of taste or a refined fancy.

This is very comprehensive; indeed, I cannot conceive of a more liberal or broad statement of the law; yet I apprehend it is a true delineation of the law."

The New Jersey Court adds:

"If the court can compel this defendant to cease his trade next door to Mr. Westcott, because the sight of these instruments used in burying the dead have an unhealthy influence on his mind, then the vender of crape, and the artist who cuts tombstones and monuments, will inevitably be liable to the same condemnation. See Demarest v. Hardhan, 34 N.J. Eq. 469, 474."

In *Stoddard v. Snodgrass*, 241 Pac. 73, 43 A.L.R. 1160, the Supreme Court of Oregon said:

"The business of conducting an undertaking establishment is not a nuisance per se. It is not only a useful and necessary occupation, but it is one that is absolutely essential to the welfare and good order of society. The carrying on of this business at the place involved was not prohibited by any statute or ordinance, and the evidence shows that, as conducted by defendants, the establishment was not a nuisance in any legal sense, since nothing injurious to life or property, or anything offensive to the physical senses, resulted therefrom. The only injury complained of is that the conduct of the business in the immediate vicinity of plaintiffs' homes had a depressing effect upon certain members of plaintiffs' families, by reason of its frequent reminder of mortality. The injury complained of was mental, rather than physical, and was one which did not affect all persons alike, but only affected those who were overnervous or supersensitive. This was not sufficient to entitle plaintiffs to the relief sought."

See also *Linsler v. Booth Undertaking Co.*, 120 Wash. 177, 206 Pac. 976.

"The remedy by injunction is summary, peculiar, and extraordinary, and ought not to be issued except for the prevention of great and irreparable mischief. It is not ex debito justiciæ for any injury threatened or done to

the estate or rights of a person, but the granting of it must always rest in the exercise of a sound discretion, governed by the nature of the case": 14 R.C.L. 307, section 5 (citing cases). "The power to grant or refuse it [injunctive relief] rests in the sound discretion of the court under the circumstances and the facts of the particular case, unless perhaps in cases where facts on which the injunction is asked present questions of law only": 43 C.J.S. 420, section 14, citing, inter alia, *Ladner v. Siegel*, 298 Pa. 487, 68 A.L.R. 1172; *City of Harrisonville, Mo. v. W. S. Dickey Clay Mfg. Co., Mo.*, 289 U. S. 334. "The power of the courts to issue injunctions should be exercised with great caution and only where the reason and necessity therefor are clearly established": 43 C.J.S. 426, section 15 (citing cases). "The court which is to exercise the discretion is the trial court and not the appellate court. The action of the court may be reviewed on appeal or error in case of a clear abuse of discretion, but not otherwise": 43 C.J.S. 426, section 14.

We find in the decree of the court below refusing to grant an injunction against the maintenance of the defendant's undertaking establishment and funeral home in the neighborhood which "is slowly becoming commercialized" (as the Chancellor said) and which contains a large cemetery, no such abuse of discretion as would require the decree's reversal. If the defendants' undertaking establishment becomes a nuisance the refusal of the injunction asked for in this proceeding will not prevent the issuance of an injunction at some later date against the same undertaking establishment in appropriate proceedings upon proper cause being shown.

It is within the police power of the City of Reading and every other city in the State to restrict undertaking establishments to certain sections of the city by reasonable zoning regulations.

The decree is affirmed at appellants' costs.