Young et al., Appellants, *v.* St. Martin's Church et al.

Argued January 3, 1949. Before Maxey, C. J., Drew, Stern, Patterson, Stearne and Jones, JJ.

*Winfield W. Crawford,* with him *Fronefield Crawford,* for appellants.

*Ledyard H. Heckscher,* with him *Wm. Charles Hogg, Jr.* and *J. H. Ward Hinkson,* for appellees.

OPINION BY MR. JUSTICE HORACE STERN, March 25, 1949:

In these proceedings the proposed establishment and maintenance of a cemetery is under attack by residents of the neighborhood.

Plaintiffs own and occupy what are stated to be "palatial dwelling houses" in Radnor, a fashionable "Main Line" suburb of Philadelphia. Their properties consist of large estates with beautiful lawns. Although the Pennsylvania Railroad passes in close proximity, and although there is a business district near by which contains a small cluster of commercial structures, and although a farm of approximately 110 acres lies on one side of the tract where the cemetery is to be located, it may be conceded, contrary to the view expressed by the court below, that the immediate neighborhood, which is the test to be applied, (*Unger v. Edgewood Garage,* 287 Pa. 14, 18, 134 A. 394, 396; *Burke v. Hollinger,* 296 Pa. 510, 520, 146 A. 115, 117; *Calvary Presbyterian Church of Highland Park v. Jones,* 322 Pa. 77, 80, 185 A. 267, 268; *Price v. Anderson,* 358 Pa. 209, 218, 56 A. 2d 215, 220) is exclusively residential in character.

St. Martin's Church, founded around 1880, is situate at the northwest corner of Glenmary Avenue and King of Prussia Road. Across from the latter highway there is an eleven acre tract of land which the church now proposes to acquire and convert into a burial ground having the characteristics and aspect of a country

churchyard; it is intended for the present to use a portion of the property as a parish house, Sunday school and rectory and ultimately to erect on the tract a new church edifice; the remaining portion is to be utilized as a cemetery providing burial lots for members of the church and such members of neighboring Protestant churches as may be approved by the vestry of St. Martin's. While the cemetery will be a large one it will not be conducted as a commercial enterprise; the project probably owes its inception to the fact that certain churches in Bryn Mawr and St. Davids no longer extend privileges of sepulture in their own cemeteries to residents of Radnor. It may be added that in contemplation of the use of the tract for cemetery purposes an application for a permit was made to the Board of Adjustment of Radnor Township and, after properly advertised notice and a public hearing, the Board directed that such a permit be granted, from which action no appeal was taken by the present plaintiffs or by any other persons whomsoever.

Plaintiffs' bill, seeking to enjoin the transfer of the premises in question from the present owner to St. Martin's Church for use as a cemetery and also to enjoin the church from establishing and maintaining a cemetery thereon, sets forth a veritable catalogue of apprehensions as to the effect the proposed cemetery will have upon the residents of the neighborhood. It is alleged that its maintenance will change the character of the locality; that there will result an increase in the automobile traffic in the neighborhood with consequent danger to children; that the value of plaintiffs' properties will be substantially decreased; that the comfort and ordinary enjoyment of their homes will be injuriously affected; that it will be necessary to suppress the outdoor play of their children during the progress of funerals; that the frequent sight of funerals and the knowledge that dead bodies are about to be buried will be a constant irritation

to plaintiffs and will likely affect their health; that the frequent visits to the site by relatives and friends of those interred therein will be a source of annoyance to them; that the care and maintenance of the cemetery lots will create disturbing noises; that there will be a percolation of surface and underground waters from the cemetery to the property owned and occupied by one of the plaintiffs and this will cause the contamination of the water of a spring which furnishes a supply of drinking-water for that plaintiff and his family. The testimony produced at the trial of the cause, however, was of a much more temperate nature and was reduced, inter alia, to such complaints as that the cemetery would not be a "beautiful thing" for the children to look at; that they, playing outdoors, would be unpleasantly affected during the passage of funeral processions; that their parents would not like to have them walk past the cemetery at night; that it would be necessary for most of the plaintiffs in going to the railroad station at Radnor to pass the cemetery, which would not only be unpleasant but might occasionally cause one to miss his train while waiting for a funeral procession to pass by; that, if a social party were planned, it might "run into a funeral"; that the whole neighborhood would be changed because "such things bring a different type of people"; that it might make it difficult to "keep colored help"; that a cemetery is "depressing" and that "the type of people who dig the graves might easily be a nuisance as well as a menace to the children walking back and forth." Unfortunately for plaintiffs, all of the more serious objections they urged were found by the chancellor to be entirely unjustified; he found as facts that the water in the spring from which one of the plaintiffs obtained his supply would *not* be contaminated by the maintenance of the cemetery; that *no* general decrease in real estate values in the neighborhood would result; that the general character of the neighborhood

would *not* be affected; that automobile traffic on nearby highways would *not* be increased to any appreciable extent; that *no* disturbing noises would be created; that the residents in the vicinity would *not* be deprived of the quiet, peaceful and safe enjoyment of their properties; that *no* substantial or irreparable injury would result to the plaintiffs or any of them. Plaintiffs are concluded by these findings of fact, concurred in, as they were, by the court en banc.

It may be, as the learned chancellor below remarked during the course of the trial, that all of us have a distaste for cemeteries, but it is a far cry from what is merely an annoyance or disagreeable intrusion to what the law regards and condemns as a nuisance. Plaintiffs concede, as they must, that a cemetery is not a nuisance *per se,* even though it be near to residential properties (see 46 C. J. 696, [§ 122] 41; 10 Am. Jur. 498, § 16). As was said in the frequently cited case of *Monk v. Packard,* 71 Me. 309, 311, "A repository of the bodies of the dead is as yet indispensable, and wherever located, it must *ex necessitate* be in the vicinity of the private property of some one who might prove its market value injuriously affected thereby." Burial grounds must be established where they are reasonably accessible to surviving relatives and friends who naturally wish to visit the graves of their dear ones; they cannot, therefore, be located in the wild, and it would probably be impossible to find a suitable tract of land within any reasonable distance of built-up areas that would not be in more or less proximity to residential properties. Not being a nuisance *per se,* it is incumbent upon those wishing to prevent the establishment of a cemetery in the neighborhood to prove that it will constitute a nuisance *in fact.* This burden of proof plaintiffs, as already stated, have failed to sustain. Their chief complaints may be characterized as falling into two classes, one materialistic and the other sentimental. The former consists of fears that their

properties will be depreciated in value; apart from the fact that the court below found to the contrary, this objection, even had it been established by the evidence, would not constitute ground for equitable relief: 10 Am. Jur. 498, § 16; 39 Am. Jur. 309, § 28; *Rhodes v. Dunbar,* 57 Pa. 274, 289, 290; *Unger v. Edgewood Garage,* 287 Pa. 14, 20, 134 A. 394, 396, 397; *Pennsylvania Company for Insurances on Lives and Granting Annuities, Trustee, v. The Sun Company,* 290 Pa. 404, 409, 138 A. 909, 910. The other class of complaints is based upon purely psychic objections, but to such equity gives no heed, for it does not regard the melancholy reflections that may be engendered in sensitive minds by the close proximity of a cemetery as sufficient to brand it a nuisance within the legal meaning of that term. To constitute a nuisance it is not enough that the activity complained of is offensive to the eye, creates mental discomfort, or makes the vicinity less attractive: 39 Am. Jur. 308, § 27. It may be added that there are many cemeteries which are places of great artistic beauty and therefore aesthetically pleasing; especially is this true of country churchyards.

It is urged that because courts have frequently enjoined the operation of morgues and undertaking establishments in strictly residential districts similar action should follow in the case of cemeteries. However, not only was such an injunction refused in *Rick v. Cramp,* 357 Pa. 83, 53 A. 2d 84, but it is obvious that there is no close analogy between mortuaries and burial grounds since in the case of the former there is involved the taking in and out of dead bodies for the purpose of autopsies and embalming, the possible permeation of adjacent homes by noxious vapors from deodorants and disinfectants, the danger of infection from communicable diseases, and, in general, conditions likely to be offensive in a *physical* sense and not merely because of their

serving as an unwelcome reminder of that "undiscover'd country from whose bourn no traveller returns."

The decree dismissing plaintiff's bill is affirmed, the parties to bear their respective costs.

———

DISSENTING OPINION BY MR. JUSTICE PATTERSON:

Although a cemetery is not a nuisance *per se,* it may become one by reason of its location, or manner of use, depending upon conditions in the locality. 87 A. L. R. 761. The majority opinion states that the proposed cemetery "will not be conducted as a commercial enterprise," and that it will have "the characteristics and aspect of a country churchyard." It does not mention, however, that what is proposed is a cemetery of more than 5000 grave sites, covering an area of 10.74 acres of ground. Nor is it emphasized by the majority that lots are to be sold not only to members of St. Martin's Church, but to members of churches in the surrounding communities as well, and to any and all other persons who may apply, subject only to approval of the Vestry of St. Martin's Church, at a price of $800 per lot. As clearly as in the case of invasion of a strictly residential community by an undertaking establishment, the operation and maintenance of such a cemetery, in the very heart of a neighborhood conceded by the majority to be "exclusively residential in character," will inevitably produce an atmosphere detrimental to the use and enjoyment of the neighboring residential properties. Such result goes beyond mere mental disturbance and should not be permitted, over the protests of those who would be materially injured thereby, in the absence of a strong showing of public necessity. See 3 Cooley on Torts (4th ed.) 180, section 435; *Bragg et al. v. Ives,* 149 Va. 482, 140 S. E. 656; *Rick v. Cramp,* 357 Pa. 83, 87-88, 53 A. 2d 84.

The mere issuance by the zoning authorities of a permit to use the property for cemetery purposes is not sufficient to deter a court of equity from declaring that the proposed use will constitute a nuisance. "Acts of municipal officers under zoning legislation permitting the use of property for what is or may be a nuisance, do not oust the jurisdiction of equity to determine whether a nuisance in fact exists and should be restrained": *Perrin's Appeal,* 305 Pa. 42, 51, 156 A. 305. See also *White v. Old York Road Country Club,* 322 Pa. 147, 152, 185 A. 316.

The decree of the court below should be reversed, with directions to reinstate the bill and grant the relief prayed for.