## Ross, et al. *v.* Philadelphia Federation of Teachers, et al.

206

Argued January 29, 1973, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT. Petition for reargument denied April 3, 1973. Per Curiam.

*Leonard M. Sagot*, with him *John J. Poserina, Jr., Thomas W. Jennings*, and *Ettinger, Poserina, Silverman, Dubin, Anapol & Sagot*, for appellants.

*Vincent J. Salandria*, with him *Edward B. Soken, Robert T. Lear* and *Alan H. Gilbert*, for appellees.

Opinion by President Judge Bowman, March 13, 1973:

In this appeal by the Philadelphia Federation of Teachers two issues are raised. The first—a threshold question of jurisdiction—is whether the lower court properly concluded that it had jurisdiction to entertain a complaint in equity under Section 1003 of the Public Employe Relations Act[1] (PERA) filed at a time when a strike by teachers in the Philadelphia school system was not yet in progress; the court recognized, however, that the equitable relief sought could not be granted until a strike was in progress.

The second issue is whether the lower court erred as a matter of law in concluding under the facts reasonably reached that the strike then in progress "created a clear and present danger of threat to the health, safety and welfare of the public," the statutory criteria for the granting of equitable relief under Section 1003 of PERA.

The history of collective bargaining between the Philadelphia Federation of Teachers and the School District of Philadelphia for the 1972-1973 school year must be briefly recited as the factual background for the issue of jurisdiction which must first be resolved.

For the prior school year of 1971-1972, the Federation and the District were parties to a collective bargaining agreement which by its terms expired August 31, 1972. Collective bargaining for a new contract had reached an impasse and while the record before us does not disclose in detail the procedures followed after impasse, it is clear that on September 5, 1972, the member teachers of the Federation did not report for work incident to the scheduled fall opening of the public schools of Philadelphia. The lower court, having justi-

---

[1] Act of July 23, 1970, P. L. 563, 43 P.S. §1101.1003.

fiably concluded that such action constituted a strike, then recites the undisputed events leading up to the filing of a complaint in equity by the District.

"As a consequence of said strike, the schools of the School District of Philadelphia were closed from September 5, 1972, until September 28, 1972, at which time the parties entered into a Memorandum of Understanding (Board Exhibit 1) in which the Union agreed to return to work under the provisions of the September 1, 1970—August 31, 1972, collective bargaining agreement.

"The aforesaid Memorandum of Understanding was due to terminate by its terms on December 31, 1972, if a new contract was not consummated by that time. A new contract agreement was not reached by December 31, 1972, but the Union agreed to a one week contract extension terminating on January 7, 1973.

"On January 3, 1973, the Philadelphia Federation of Teachers conducted a general membership meeting at which meeting a vote of the Philadelphia Federation of Teachers bargaining unit members was taken concerning whether to accept the report and recommendation of Arnold M. Zack, Esquire, the Fact Finder designated by the Pennsylvania Labor Relations Board to hear the facts relevant to the impasse between the Philadelphia Federation of Teachers and the Board of Education of the School District of Philadelphia. By a vote of 8,745 to 1,850 the Philadelphia Federation of Teachers voted to reject the report and recommendations and to strike the School District of Philadelphia, effective January 8, 1973."

Faced with this declaration by the Federation to resume the strike, the District filed its complaint in equity seeking injunctive relief on Thursday, January 4, 1973. The Federation promptly filed preliminary objections to the complaint asserting that a court of eq-

uity was without jurisdiction under the statute as no strike was in progress as of January 4, 1973.

By opinion and order dated January 5, 1973, the lower court sustained the preliminary objections "to the extent it deals with the jurisdiction of the court . . . to grant an injunction before a strike actually occurs." It further ordered hearings on the complaint to begin Monday, January 8, 1973, which was the date fixed by the Federation for resumption of the strike and on which date the strike was in fact resumed.

In *Calabrese v. Collier Township Municipal Authority*, 430 Pa. 289, 240 A. 2d 544 (1968), our Supreme Court clearly delineated the equity jurisdiction of courts of common pleas in Pennsylvania. It said:

"Insofar as the exercise of equity jurisdiction by a court of common pleas is concerned, Pennsylvania's legal history is unique. Although from earliest times courts of common pleas in Pennsylvania did recognize and apply equitable principles *as part of the common law* of the Commonwealth (Morton's Estate, 201 Pa. 269, 270, 271, 50 A. 933 (1902)), courts of common pleas were strictly common law courts which neither possessed nor exercised the powers of a court of chancery by reason of an existing public prejudice against chancery courts. However, gradually over the years, by constitutional fiat (cf. Art. V, §20 of the Constitution of Pennsylvania) and by legislation, courts of common pleas were granted chancery powers in certain specified areas. However, the extent to which a court of common pleas may exercise such chancery powers lies within the control of the legislature.

"A court of common pleas is a constitutional court whose jurisdiction is general in all matters involving the law but is limited in matters involving equity to the extent delineated by the legislature." 430 Pa. at

295-96, 240 A. 2d at 547-48 (Emphasis in original; footnotes omitted.)

As applied to this case we must, therefore, look to the legislative grant of equity jurisdiction with respect to strikes by public employees. Section 1003 of PERA provides in part: "If a strike by public employes occurs . . . it shall not be prohibited unless and until such a strike creates a clear and present danger or threat to the health, safety or welfare of the public. In such cases the public employer shall initiate . . . an action for equitable relief including but not limited to appropriate injunctions and shall be entitled to such relief if the court finds that the strike creates a clear and present danger or threat to the health, safety or welfare of the public."

Appellants would have us conclude that since a strike was not in progress on January 4, 1973, a strike had not occurred and therefore the lower court then lacked jurisdiction to entertain the District's complaint in equity as of that date. Such a contention ignores the reality of the facts and is contrary to the grant of equity jurisdiction conferred upon courts of common pleas by the statute. In reality a strike had long since occurred and had persisted for some three weeks prior to its suspension under the heretofore referred to Memorandum of Understanding. Such a strike having occurred, the condition of the statute upon which the court's equity jurisdiction was predicated was met, and its jurisdiction to entertain the complaint in equity properly attached. That the Court could not then grant the equitable relief provided by the statute until hearing and proof of a clear and present danger or threat to public health, welfare or safety in no way diminishes or further conditions the statutory grant to entertain such an equitable action.

Before considering the second issue, i.e., whether or not the lower court erred as a matter of law in concluding that the strike "created a clear and present danger or threat to the health, safety [or] welfare of the public," we must first determine this Court's scope of review. A multitude of authorities stands for the proposition that the scope of review in such a case is severely restricted. The most common expressions of this are couched in terms of "manifest error," "clear abuse of discretion," "reasonable grounds," et al. One of the earlier cases so stating was *Steinmeyer v. Siebert*, 190 Pa. 471, 42 A. 880 (1899), where the Court said that the findings of the chancellor will not be disturbed by the appellate court "except for error which clearly appears. An apparent preponderance of testimony against [such findings] is not sufficient to lead to a reversal, if there is testimony which if believed will warrant [the findings]." 190 Pa. at 475, 42 A. at 881. This position is now stated in 9 Standard Pennsylvania Practice, Ch. 40, §113. Similarly, in *Commonwealth Trust Company, Admr., v. Szabo*, 391 Pa. 272, 276-77, 138 A. 2d 85, 87 (1957), the Court said that "a chancellor's findings of fact, approved by a court en banc, have all the force and effect of a jury's verdict if they are supported by adequate evidence and ordinarily will not be disturbed on appeal: [citations omitted]." This was subject, however, to the limitation that the chancellor's " 'conclusions, whether of law or ultimate fact, are no more than his reasoning from the underlying facts and are reviewable,' especially 'where the underlying facts themselves are not in esse but are matter of inference and deduction': [citations omitted]." *Accord, Shapiro v. Shapiro*, 424 Pa. 120, 127, 224 A. 2d 164, 168 (1966).

The narrow standard of "manifest error" as to scope of review is stated in 9 Standard Pennsylvania

Practice, Ch. 40, §113, with regard to findings in equity: "Ordinarily, when the appellate court ascertains that the conclusions of fact reached by the trial court rest upon sufficient evidence and that the record discloses no manifest error in the deduction from the evidence, its duty in this respect has been fully discharged.

"The findings of fact of a chancellor . . . will not be disturbed on appeal, in the absence of clear error, if they are supported by adequate evidence or reasonable inferences therefrom. . . ." [Footnotes omitted.] *Accord, Scientific Living, Inc. v. Hohensee,* 440 Pa. 280, 270 A. 2d 216 (1970), *cert. denied,* 402 U.S. 1012 (1971), *rehearing denied,* 404 U.S. 874 (1971). This narrow standard is predicated on the chancellor's having had the opportunity to hear and observe witnesses.

Concerning scope of review as to injunctions, 43 C.J.S. *Injunctions* §14 states: "The action of the court may be reviewed on appeal or error in case of a clear abuse of discretion, but not otherwise. . . ." *Accord, Stander v. Kelley,* 432 Pa. 1, 246 A. 2d 649 (1968); *Rick v. Cramp,* 357 Pa. 83, 53 A. 2d 84 (1947); 5A C.J.S. *Appeal & Error* §1591. This same standard has been adopted by the federal courts: *United States v. Edwards,* 333 F. 2d 575, 578 (5th Cir. 1964).

This Court itself has had occasion to deal with the issue of appellate review vis-a-vis injunctions. In *Armstrong School District v. Armstrong Education Association,* 5 Pa. Commonwealth Ct. 378, 382, 291 A. 2d 120, 123 (1972), we said, "In reviewing the lower court's action in issuing an injunction, our scope of review, as with other types of equity matters, is limited, ' "(W)e will look only to see if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the

rules of law relied on are palpably wrong or clearly inapplicable: . . ." [citations omitted].'" The "reasonable grounds" criterion does not permit a broad scope of review.

Thus, insofar as concerns a chancellor's findings of facts (not his inferences and deductions from facts not in esse), the law is clear that an appellate court can review these findings only where there has been manifest or clear error, a clear abuse of discretion, etc. Given sufficient evidence which justifies the findings and logically sound, reasonable inferences and conclusions derived therefrom, the chancellor's decision will stand. Even a preponderance of testimony against the findings will be insufficient if there is testimony which, if believed, will warrant them. *Steinmeyer, supra;* 9 Standard Pennsylvania Practice, Ch. 40, §113. In summary, there must have been apparently reasonable grounds for the action of the lower court.

We thus reach the merits of the second issue.

Having carefully reviewed the record consistent with our scope of review, we affirm the lower court's judgment that, as of the date it was rendered, the Philadelphia school teachers' strike created a clear and present danger or threat to the health, safety or welfare of the public. Having thus met the statutory criteria for the granting of equitable relief, it properly exercised its power in issuing the injunction in question.

In the case at bar the lower court centered its concern upon the school pupils themselves as a segment of the public entitled to the protection of the statute. We need not decide, however, whether school pupils are a segment of the public entitled to the statute's protection absent proof of clear and present danger or threat to the health, safety or welfare of the public at large. This is so because the lower court also found the strike's

impact to have threatened all segments of the public, i.e., the public at large. When increased gang activity is threatened, when an additional $133,000 per day is expended by the city for additional police protection and when the financial aid to a debt-ridden school district is in jeopardy even though its loss is not a present reality, all these are ramifications which affect virtually all segments of the public.

In *Armstrong, supra,* this Court discussed at length the meaning of "clear and present danger" under PERA, and, therefore, we need not now do the same. However, we must emphasize what we said there: with regard to strikes by public employees, "the Legislature may be understood to have indicated its willingness to accept certain inconveniences, for such are inevitable, but it obviously intended to draw the line at those [strikes] which pose a danger to the public health, safety or welfare." 5 Pa. Commonwealth Ct. at 384, 291 A. 2d at 124.

Although the lower court (as well as this Court in *Armstrong*) focused its attention on the meaning of "clear and present danger," the alternative criterion for judicial action cannot be ignored—the creation of a "threat to the public health, safety or welfare."

*The Random House Dictionary of the English Language* (College Edition 1969) defines a "threat" as "an indication or warning of probable trouble. . . ." *The American Heritage Dictionary of the English Language* (1970) defines "threat" as "[a]n indication of impending danger or harm."

The same factors discussed above which contribute to the "public" effect of the strike are equally significant in contributing to the existence of a threat to the health, safety or welfare of that public. The lower court reasonably found the possibility of increased gang activity, that the existence of the strike required substan-

tial increase in costs of police protection to public property and posed the possibility of loss of state aid to the school district. To these conditions significant impacts upon the school population, as reasonably found to exist by the lower court, must be added. Having already lost some fifteen instructional days in September, 1972, the pupils of the system, particularly the substantial number of those who are underachievers, were faced with an unknown number of additional days of instructional idleness which may or may not be made up later in the school year. To suggest that such a substantial loss of number of instructional days can be made up later in the year—a position which is far from clear in this case—is but to recognize the importance of a minimum number of instructional days to meet minimum educational standards and to equally recognize that a lesser number is a very real threat to the health and welfare of at least the school population segment of the public. Nor should we overlook the high school seniors intending to further their education, who are indeed threatened in a real sense with respect to qualifying for college entrance.

It is neither possible nor prudent to state with precision that any one or more given circumstances surrounding a strike by school teachers will constitute a threat to the health, safety or welfare of the public. Nor do we decide that any particular number of days of lost instruction caused by a strike produces such a threat. We do decide in the instant case that the facts reasonably found to exist by the lower court are sufficient to establish as a matter of law a threat to the health, welfare or safety of the public. To deny this would ignore reality and afford no particular meaning to the legislative mandate that not only strikes which create a clear and present danger may be enjoined, but

also those that create a threat to the health, safety or welfare of the public.

We are not laying down a special rule for Philadelphia which appellants argue must follow if we affirm the lower court. In *Armstrong, supra,* we did not lay down a rule for that county. Here, within our narrow scope of review, we are affirming the lower court under a given set of circumstances. Given the same set of circumstances in any school district of the Commonwealth involved in a teachers' strike the result would be the same.[2]

Order affirmed.

---

DISSENTING OPINION BY JUDGE CRUMLISH, JR.:

I disagree with the conclusion that the Court of Common Pleas of Philadelphia County had jurisdiction to enjoin the teachers' strike. I would hold that the complaint should have been dismissed because the complaint was filed prematurely. I do not accept appellees' position that the work stoppage which commenced on January 8, 1973 was a resumption of the strike which occurred in September 1972.

A "strike" is defined by *Webster's Seventh New Collegiate Dictionary* as a "work stoppage by a body of workers to enforce compliance with demands on an em-

---

[2] This Court cannot ignore the fact that the present strike represents a continuing violation of the injunction issued by the lower court, whose order is the law of the case unless and until reversed. In this class of cases appellate courts should not disregard the status of those already in defiance of the law who cavalierly seek appellate review while in defiance of the very judicial system in which they seek redress. Appellate courts, in such instances, should refuse to act upon appeals until appellants are in compliance with the order appealed from unless such order is superseded.

In the instant case we refrain from taking such a stand only in deference to the high public importance and public interest in its prompt disposition on the merits.

ployer." Since the cessation of work is the essential feature of a strike, a return to work logically implies that the strike has ended. It is unrealistic to hold that when the teachers left work on January 8, 1973 after months of attendance to their duties that this was a resumption of a strike which began in September 1972. Either you are at work, or you are not. In this instance, they were at work during the period which included the day on which the complaint was filed.

No one denies that the jurisdiction of a court in equity must be determined by what appears on the face of the complaint itself and upon the conditions existing at the time the complaint was filed. *Brenner v. Sukenik*, 410 Pa. 324, 189 A. 2d 246 (1963); *Lafean v. American Caramel Company*, 271 Pa. 276, 114 A. 622 (1921). In *Brenner*, it was held that no equity jurisdiction existed in the lower court because the facts as they appeared on the face of the complaint had not yet occurred at the time of the filing. It was said there: "The question of equity's jurisdiction must be determined on the facts and circumstances existing upon the date the action is instituted." 410 Pa. at 328, 189 A. 2d at 248.

Looking to the instant situation, we find the following sequence: The teachers voted on January 3rd to strike January 8th; the complaint was filed January 4th; the facts at that time which would make out a cause of action did not exist. The court below recognized this when it refused to prospectively enjoin the strike before January 8th. We all know that this is an issue of great public importance and general concern but I do not believe that the import of a case graces us with the right to disregard basic and unequivocal rules of law.

There being no jurisdiction in the court below, it is unnecessary to reach the issue of clear and present danger or threat to the general welfare.

DISSENTING OPINION BY JUDGE BLATT:

It is with great reluctance that I dissent from the ably written and very persuasive opinion of the majority, and it is with equal regret that I find it impossible to agree with the distinguished judge of the Philadelphia Court of Common Pleas before whom the action was brought which is the subject of this appeal and whose order was not only defied after it was issued but promised defiance even before it was handed down. Moreover, I find myself most reluctant to take a position which may seem to favor a group of appellants who continued in open defiance of the lower court's order even while appealing to this Court for relief. Respect for and compliance with orderly judicial process is essential for responsible self-government.

It is my considered opinion, however, that the majority is in error in two respects: (1) in holding that there was a strike in existence at the time when the original complaint was filed on Thursday, January 4, 1973, and (2) in holding, even if it could be accurately said that a strike did exist when this complaint was filed, that there was a "clear and present danger or threat to the health, safety or welfare of the public" either then or on Thursday, January 11, 1973, when the injunction was issued.

As to the existence of a strike on Thursday, January 4, 1973, the filing date of the complaint, the majority and the lower court judge are in evident disagreement. The lower court judge sustained the preliminary objections of the defendants, which alleged that no strike had yet occurred and that, therefore, none could yet be enjoined. He obviously believed that no strike yet existed, but he retained jurisdiction of the case in the anticipation that a strike would ultimately occur on Monday, January 8, 1973, as it did. The majority holds, on the other hand, that the strike actually began on

September 5, 1972, was temporarily suspended on September 28, 1972, but was continually in existence up to January 4 and thereafter.

As I read the record, the strike here concerned began on Monday, January 8, 1973, and the lower court had no jurisdiction to entertain a complaint four days prior to that date. As the majority points out, the jurisdiction of a court of equity in Pennsylvania is limited. See *Armstrong School District v. Armstrong Education Association*, 5 Pa. Commonwealth Ct. 387, 291 A. 2d 125 (1972). As is equally clear, the statutory authority for an injunction in this case is contained in Section 1003 of the Public Employe Relations Act, Act of July 23, 1970, P. L. 563, 43 P.S. §1101.1003 (hereinafter PERA), which permits injunctions only to stop a strike which has already begun. As we stated in *Armstrong, supra*: "It is clear from a reading of Section 1003 . . . that the court is empowered thereby to grant equitable relief *only to end* a public employes' strike." (Emphasis added.) 5 Pa. Commonwealth Ct. at 392, 291 A. 2d at 128.

A strike, it seems to me, must mean a stoppage of work. " 'A strike is a concerted refusal by employees to do any work for their employer . . . until the object of the strike is obtained. . . .' " *Dydo Unemployment Compensation Case*, 189 Pa. Superior Ct. 286, 291, 150 A. 2d 591, 594 (1959). Yet the defendants here were at work regularly from September 28, 1972 to the date of the complaint on January 4, 1973 and, presumably even somewhat beyond that date.[1] Employees simply cannot be "on strike" and "at work" simultaneously, not even if, as here, they once previously during the

---

[1] There is no evidence in the record that the defendants did not work on both Thursday and Friday, January 4 and 5, which were normal school days, or that any who were required to perform any duties on Saturday and Sunday, January 6 and 7, did not do so.

school year were on strike and have voted to go on strike again at some later date. Only when they actually leave their work without permission, can they be on strike, and, of course, it follows that until such time there is no strike to be enjoined.

The fact that a strike did occur on Monday, January 8, 1973, and that the lower court held a hearing on that day might have justified the granting of an injunction in response to a complaint filed *on that day,* if, of course, the supporting evidence as to its "clear and present danger or threat to the health, safety or welfare of the public" was sufficient. But it cannot justify the granting of an injunction in response to a complaint which was filed too early, even if jurisdiction was thereafter retained in error.

To the layman, the distinction herein made may well seem a distinction without a difference, the defendants having finally done what the plaintiffs charged them with doing before they did it, and, indeed, what they had voted to do. However, the law is clear that "[t]he question of equity's jurisdiction must be determined on the facts and circumstances existing *upon the date the action is instituted. . . ."* *Brenner v. Sukenik,* 410 Pa. 324, 328, 189 A. 2d 246, 248 (1963) (Emphasis added.) To say that a new complaint could easily have been filed on Monday, January 8, 1973, is to state the obvious, and, if a new complaint had been filed, no doubt the hearing and the injunction would have proceeded just as they did. The facts here, however, are that a new complaint was *not* filed on Monday, January 8, 1973, and that the preliminary objections of defendants to the complaint filed on Thursday, January 4, 1973, had been sustained on January 5, 1973, by the court below on the very grounds that the strike had not yet occurred. The lower court's jurisdiction was determined as of January 4, 1973, the day the complaint

was filed, and on that day the strike concerned here had not yet begun. As a former Chief Justice of our Supreme Court well said: "No emergency, real or feared, and no alleged hardship to a complaining party, however great, can justify a court's entertaining and passing upon a subject matter which is not within its jurisdictional competence." *Pennsylvania Railroad Company v. Pennsylvania Public Utility Commission*, 396 Pa. 34, 38, 152 A. 2d 422, 424 (1959).

As to whether or not the strike which did finally begin on January 8, 1973, constituted a "clear and present danger or threat to the health, safety or welfare of the public," the majority is, of course, correct when it holds that the scope of review by this Court is limited and that we must find manifest error or abuse of discretion on the part of the lower court if we would reverse its findings. But, even within these narrow limits, it seems clear that, giving the fullest possible weight to the testimony received, there simply was not enough credible evidence of a *clear and present* danger or threat to the health, safety or welfare of the public either *on Monday, January 8, 1973*, when the hearing was held, or *on Thursday, January 11, 1973*, when the injunction was issued.

These dates are highly significant, for they indicate that the strike complained of had been in existence for only one day at the time of the hearing and only four days at the time of the granting of the injunction, measuring the time very generously in each case. The problems cited by the plaintiffs at the hearing were of an anticipated nature, and necessarily so, for the hearing was held when the schools had actually been closed for only a few hours. It was claimed, for example, that the large percentage of under-achievers in the Philadelphia school system would be progressively harmed as the strike continued, but the extent of that harm was

never very clearly described and was certainly not proved. It was also claimed that the City and/or the plaintiffs would be burdened by excessive security expense, but there was no testimony as to the exact security actually required to keep order, as to the current need for such security, or as to what its cost in the future might be. These and many other problems might well have been expected to arise in a strike of any duration, of course, but, at the time concerned here, this strike had hardly begun. The testimony offered, therefore, could be nothing but an estimate of potential danger or threat, not evidence of a danger or threat that was clear and present.

Certainly the General Assembly of Pennsylvania knew when it enacted PERA, and when it gave teachers and other public employees the right to strike under certain circumstances, that any strike by any public employees would necessarily involve some expenses and some inconvenience, some danger and some threat to the public health, safety or welfare. Clearly it knew that any strike of school teachers in any school district in the state would necessarily involve some expense and some inconvenience, some danger and some threat for the students, their parents and the public in general. Surely it knew that Philadelphia and certain other school districts have large percentages of under-achieving students and that school security in cases of strike might well be a problem in any district and, perhaps, a special problem in large urban districts such as Philadelphia. The General Assembly, however, made no exception in the Act for any such allegedly exceptional districts. Nor may this Court. And, if exceptions seem desirable, as the plaintiffs have argued and as may well be true, providing them is the job of the General Assembly, not of the courts. The General Assembly has laid down the rule in PERA that, in all cases where

a strike by public employees is to be enjoined, there must be found "a clear and present danger or threat to the health, safety or welfare of the public," and that "danger or threat" must be clear and present, not merely anticipated. *Armstrong School District v. Armstrong Education Association,* 5 Pa. Commonwealth Ct. 378, 291 A. 2d 120 (1972). Moreover, it seems obvious to me that the words "clear and present" as used here, must be understood to modify both the word "danger" and the word "threat," and one must be as "clear and present" as the other.

As the majority has stated, any decision in cases of this kind must be confined to the special facts of the particular case concerned. It must also be remembered that an injunction is an extraordinary remedy and should be used sparingly. In this case, however, both the majority here and the court below have found a strike to exist, which constituted a clear and present danger or threat to the health, safety or welfare of the public, when, as I read the record, neither condition was clearly proved as of the date in each case required. If the complaint had been filed later, and if, at a hearing on a timely filed complaint, there had been substantial evidence presented on which the court below might reasonably have found a clear and present danger or threat to the health, safety or welfare of the public existed at that time, I would agree that an injunction might readily have been issued then. On January 11, 1973, however, and under the circumstances of this case, it is my opinion that the issuance of an injunction was premature.

Judge MENCER joins in this dissent.