## Commonwealth *v.* National Gettysburg Battlefield Tower, Inc., et al.

232

Argued December 6, 1972, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*J. Shane Creamer*, Attorney General, with him *Paul J. Carey, Jr.*, Deputy Attorney General, and *Ed Weintraub*, Deputy Attorney General, for appellant.

*Jerome H. Gerber*, with him *Handler, Gerber, Widmer and Weinstock*, for appellees.

*Louis J. Lefkowitz*, Attorney General, with him *Samuel A. Hirshowitz*, First Assistant Attorney General of the State of New York, and *Philip Weinberg* and *Joel H. Sachs*, on an amicus curiae brief for the State of New York, for reversal.

*Robert E. Woodside*, on an amicus curiae brief for himself, for affirmance.

OPINION BY JUDGE ROGERS, April 3, 1973:

As the pleasant Pennsylvania countryside within the triangle of the Alleghenies, the Susquehanna and the Maryland line provided the site for the maneuvers of two great armies in the last days of June 1863, and as the fields around Gettysburg provided the place for the decisive three first days of July of that year, this lawsuit is a testing ground of important and fundamental interests, one old the other new, in serious conflict. The appellees, National Gettysburg Battlefield Tower, Inc., and its individual principals, desire to construct a tower 307 feet high at a location in the area of the fighting of July 3, 1863, 400 feet from the nearest boundary of the Gettysburg National Military Park, 750 feet from the Gettysburg National Military Cemetery, 1200 feet from the place where President Lincoln

delivered the Gettysburg Address and 2500 feet from the hilltop where Pickett's charge broke against valiant Massachusetts, Minnesota, Michigan and Pennsylvania regiments. The Commonwealth by its Attorney General has instituted this action to restrain the erection of the tower.

There are no regulations of Cumberland Township, Adams County, the municipality in which the site is located, governing the construction of towers; indeed, there is not one zoning ordinance in all of Adams County. The plans for the tower have, however, been approved for safety by the Department of Labor and Industry of the Commonwealth. By familiar principles, the appellees, as the owners of the site, may use their property as they please, provided they do not interfere with their neighbors' reasonable enjoyment of their properties and subject to reasonable regulations for the public good imposed under the police power of the State, of which there are none here. This right derives from Article I, Sections 1 and 10 of the Pennsylvania Constitution[1] and the Fourteenth Amendment[2] to the Federal Constitution.

The Commonwealth's case is based entirely upon Article I, Section 27 of the State Constitution ratified by the people on May 18, 1971 and providing: "The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public nat-

---

[1] Section 1 provides pertinently: "All men . . . have certain inherent and indefeasible rights, among which [is that] . . . of acquiring, possessing and protecting property. . . ." Section 10 provides, inter alia: "[N]or shall private property be taken or applied to public use without authority of law and without just compensation being first made or secured."

[2] Section 1 of the Fourteenth Amendment provides, inter alia, that no State shall ". . . deprive any person of life, liberty, or property, without due process of law. . . ."

ural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people." It is contended by the Commonwealth that this new provision of fundamental law reserved new rights for the people to be asserted through their government. It set about to prove a denial of the peoples' right to the preservation of the natural, scenic, historic and aesthetic values of the Gettysburg Battlefield environment by the opinions of persons who believed that the project would injure those values. The Honorable JOHN A. MACPHAIL, President Judge of the Court of Common Pleas of Adams County, concluded that the Commonwealth had not met its burden of proving that the tower would indeed so injure the values sought to be protected as to justify the extraordinary relief demanded.

The purpose of the tower is to provide a place far above the battlefield to which persons may, for a price, be taken to observe the site of and be instructed concerning the battle of Gettysburg. The topmost of three observation decks will be one hundred feet higher than Big Round Top, the highest natural point in the area. The core of the tower will be elevator shafts enclosed in wire mesh. Lending support to the top will be a curvilinear arrangement of pipes from ground to summit. The general shape will be that of an attenuated hourglass, solid only at bottom and top. The site now suggested is the third proposed, the appellees having on two prior occasions relocated at the request of the National Park Service. Indeed, the appellees had commenced construction of a tower at a residential site. On June 14, 1971, the Secretary of the Interior of the United States wrote to the Governor of Pennsylvania expressing his Department's and its National Park Service's concern with the tower then being erected and

seeking the State's intervention to block its construction. In early July 1971, the appellees and the United States entered into a written agreement the terms of which for our purposes are adequately described by a Department of Interior, National Park Service, News Release for Sunday, July 11, 1971, as follows:

## "GETTYSBURG TOWER SITE MOVED AWAY FROM BATTLEFIELD CENTER

"The firm planning to build a tower overlooking Gettysburg National Military Park, Pa., has reached an agreement with the government to move from a location near the heart of the famous Civil War battleground to one screened by trees from the visitors center, George B. Hartzog, Jr., Director, National Park Service, announced today.

"The agreement between the National Park Service and businessman Thomas R. Ottenstein, Silver Springs, Md., will change the construction site to one preferred by the Interior Department. It was reached through negotiations between Ottenstein and Interior Department Special Assistant J. C. Herbert Bryant, Jr.

"Its terms provide that Ottenstein will stop building at the present site and convey the three acres to the National Park Service, which will use the property to provide much needed additional parking for battlefield visitors.

"Hartzog said that additional advantages of the new site are relief of projected traffic congestion and the provision of enough parking to accommodate tourist tower visitors.

"As earlier planned, the tower would have loomed over the battlefield visitor center and the site of Abraham Lincoln's Gettysburg Address, Hartzog said.

" 'The old location is just west of Emmittsburg Road which is the main entrance to Gettysburg,' he

said, 'and the location of the tower threatened major traffic congestion.'

" ' The new location, east of the Taneytown Road and behind trees near the base of a hill, will hide the base of the tower and its parking lot from the main battlefield area.'

"The National Park Service will permit a right-of-way for limited access from the Taneytown road to the new observation tower site.

"Hartzog said the right-of-way will consist of a one-way, one-lane road for vehicular traffic not exceeding 12 feet in width, and a sidewalk for pedestrians, and it will be landscaped.

"Hartzog also announced that Ottenstein will set up a nonprofit corporation or foundation to help support historically related institutions and activities at the Battlefield, including the Eisenhower National Historic Site.

"Under the agreement, five percent of the taxable income from the tower operation will be utilized for these purposes." The new site referred to is the location now proposed.

The Commonwealth's witnesses were persons of eminence in their professions or occupations: architects Louis I. Kahn and Vincent Kling; historian and author Bruce Catton; historians Sylvester K. Stevens and Charles H. Glatfelter; the Pastor of a Gettysburg Presbyterian congregation, the Reverend Robert A. MacAskill; a theologian and teacher at the local Lutheran Seminary, Robert Jansen; the Commonwealth's Director of State Parks, Conrad Lickel; and Federal Park Administrators Thomas J. Harrison and George Hartzog. Each of these gave his opinion of the effect the proposed tower would have on the values protected by Article I, Section 27 of the Constitution within his area of competence. We have examined their testimony, as did the Chancellor, with the care and respect their

achievements merit. A fair, brief statement of this testimony is, we believe, the following.

Mr. Kahn studied the blueprints for the tower and concluded that the structure is carefully planned with the intention of being gossamer or of trying to disappear. He nevertheless believes that it would be a marked intrusion on the pastoral serenity of the battlefield scene and out-of-scale with its surroundings. Mr. Kahn's viewpoint was from that of one walking the battlefield in a state of sympathy with the combatants of 1863 and of reverence for what occurred there, who, looking up to the tower would experience an intrusion upon those sentiments by this "scribbling in the sky." The values of Gettysburg for Mr. Kahn lie in its pastoral setting upon which, in his opinion, the presence of the tower would be an unwanted reminder of utilitarian interests.

Mr. Kling finds the tower as designed inappropriate for the site and lacking in esthetic qualities. His viewpoint was of one looking at the tower over acres of greens. He concedes that the hourglass shaped wrapping for the structure "has integrity," but believes that the interior elevator shaft would overwhelm the outside laciness. Although not opposed to towers he believes this one to be too big, ungainly in its core and commercialistic at the top.

Mr. Catton stated that the great historical and cultural values of Gettysburg are in its having witnessed the climactic struggle of the Civil War, which he believes was the biggest single event in the American experience. In order fully to experience those values Mr. Catton believes it necessary for one to go on the field in person, to brood while there, to translate oneself into the 1860's and to feel the spirit and courage that animated the men who fought there. It is his opinion that the tower would jar a person so experi-

encing the battlefield back into the present day and so diminish the historic and cultural values.

Mr. Stevens, the Executive Director of the Pennsylvania Historical and Museum Commission and Chairman of the Advisory Counsel on Historic Preservation to the Secretary of Interior, the function of which latter is to review and make recommendations concerning matters which might affect historic sites, views Gettysburg as a shrine which the tower would overpower. It is his feeling that the greatest benefits of a personal visit to Gettysburg are to be obtained by first visiting the reception center of the National Park Service and then touring the field on foot.

Mr. Glatfelter, Chairman of the History Department at Gettysburg College and a resident of the area for 22 years, discerns educational advantages through the use of the tower but believes that these would be outweighed by the disadvantage of its inappropriately large size and height.

The Reverend Mr. MacAskill believes that the tower would intrude upon an atmosphere of reverence created by the pastoral nature of the site and the association with the cemetery set aside by President Lincoln.

The Reverend Mr. Jansen, an educator as well as clergyman, admits that the tower by providing an overview of the battlefield might add educational value to Gettysburg. He nevertheless believes that the unique feature of Gettysburg is the opportunity it affords interested persons to walk the fields and thereby establish a relationship with the past. The tower would in his opinion be an intrusion upon and distraction to one seeking this kind of experience.

Mr. Harrison, Acting Superintendent of Gettysburg Battlefield National Park, testified in his private capacity and not for the Park Service. He sees the tower as an intrusion on the "history scape" and the "ecological values" of the Gettysburg National Park environ-

ment. While admitting that a number of towers have existed in the Park for many years, he states that in accordance with a master plan developed by the National Park Service these towers are to be reduced in height or removed.

Finally, Mr. Hartzog, Director of the National Park Service and Executive Director of the Advisory Counsel of Historic Preservation, testified that he had objected to the construction of a tower at Gettysburg from the time it was first proposed in 1970. He recommended that the Secretary of Interior attempt to oppose it in May 1971, by litigation if necessary. Apparently at least partially as the result of his efforts, the appellees twice relocated their tower site finally fixing on the present location because it is within an area of the comprehensive plan of the Park proposed for intensive commercial development. Mr. Hartzog admits having suggested that the location of the tower be in one of these commercial areas and the agreement hereinbefore mentioned between the government and the appellees was the result of this suggestion. The purpose of the Service in negotiating and the government in entering into the agreement was to minimize the adverse impact of the tower. Only after the agreement was announced in July 1971 did anyone suggest obtaining the recommendation of the Advisory Council on Historic Preservation. As Mr. Hartzog expressed it, the matter "moved around" in the bureaucratic process until January 1972, two months after the final order in this matter, and the committee's report was not forwarded to the Secretary until May of 1972.[3]

---

[3] The final order of the court below was made January 13, 1972. The Commonwealth appealed. When in the following May the Advisory Committee published its report recommending that the Department assist the Commonwealth in opposing the tower, the Commonwealth asked us to remand so that the lower court might consider the report as new evidence. We did so, and a fur-

The appellees' evidence consisted of the testimony of the designer of the tower, and that of Harry F. Biesecker, an Adams County Commissioner, and Mario Menesini, an expert and consultant in education with particular knowledge of environmental education.

Mr. Biesecker, a native of Adams County, described various towers which have existed at Gettysburg, including observation platforms provided by the National Park Service. He expressed his belief that the tower would attract more tourists to the financial benefit of the community. He had in his possession a petition signed by about ten percent of the registered electors of Adams County favoring the construction of the tower.

Mr. Menesini in anticipation of testifying had examined the Park and mingled briefly with the tourists there. It is his opinion that most of the visitors to the Park stay only a short time, are not academicians and desire a rapid view of the site and a quick understanding of the battle. He believes that the view from the tower accompanied by planned audio and visual aids would be of educational value to the large majority of the 4,000,000 annual visitors who, while interested generally, are unable or unwilling to spend several days tramping the fields with books and guides.

The evidence includes proof that adjacent to or very near the National Military Park are located a variety

ther hearing was conducted. The Chancellor found the report not dissimilar to a report of another body assisting the Secretary of the Interior called the Citizens Advisory Board on National Parks, Historical Sites, Buildings and Monuments which had been before him at the trial. The court was not impelled to alter its conclusion that the government of the United States had sanctioned or approved the new site by its agreement with the appellees. While we might not place the same emphasis on this agreement as did the Chancellor, we believe the agreement does, at the very least, express the preference of the government to endure the tower at the new site under the agreement to the hazards of litigation seeking to prevent its placement at the residential sites earlier proposed.

of commercial ventures, including a junkyard, motels, restaurants, fast food establishments, souvenir stands, an amusement park, gasoline service stations, commercial museums and exhibits and a variety of advertising signs and billboards.

Judge MACPHAIL made detailed findings concerning the location and characteristics of the tower, the neighborhood of the Park, the agreement between the government and the appellees and an ultimate finding that the tower would not injure the natural, scenic, historic or esthetic values of the Gettysburg environment but would provide educational benefit to those who use it. He concluded that the Commonwealth had failed to show by clear and convincing proof that the mentioned values would be injured by the erection of the tower.

A number of defenses, in addition to the ultimate issue of whether a threatened injury to protected environmental values was proven, were interposed by the appellees below. All were decided in the Commonwealth's favor and none save two need extended discussion here.[4] The exceptions are the questions whether Article I, Section 27 is self-executing and, if so, whether the Attorney General is the proper officer to enforce its requirements. We agree with the Chancellor's affirmative answer to both.

---

[4] The appellees contend that an injunction would violate their due process rights. The Chancellor held that property would not be taken by an injunction but regulated by authority of fundamental law. The appellees claim that an injunction would deny them equal protection because other offensive establishments were not proceeded against. The Chancellor answered that Article I, Section 27 was not discriminatorily invoked merely because it was directed against a new alleged threat leaving uses established long before its adoption unquestioned. Finally, the appellees contend that the establishment of the National Park Service preempted State regulation at and presumably near the Gettysburg Battlefield National Park. The Chancellor held that the appellees' lands, being outside the National Park limits, were not subject to Federal regulation. We agree on all points.

The first phrase of Article I, to which Section 27 is a late addition, is a declaration, not of the hope that the Legislature will sanction the rights therein reserved to the people, but that such rights are thereby "recognized and unalterably established." Article I, Section 25 provides that the rights described in Article I should remain "inviolate." We find no more reason to hold that Section 27 needs legislative definition than that the peoples' freedoms of religion and speech should wait upon the pleasure of the General Assembly. Further, uniquely among the Sections of Article I, Section 27 confers upon the Commonwealth a definite status and imposes upon it an affirmative duty. The State is made trustee of the rights of the people in the enumerated values of the environment and of natural resources, and it is directed to conserve and maintain those values and resources. Section 27 is, we conceive, more than a declaration of rights not to be denied by government; it establishes rights to be protected by government. Indeed, the nature of those rights suggests the different role of government. Whereas restrictions upon speech, press and the practice of religion, invasions of the security of persons and their property and the imposition of arbitrary punishment, for examples, are activities that governments historically undertook, the despoliation of the environment is an act to be expected, in our private ownership society, from private persons. Therefore, government must act in the people's interest; and government as trustee is no stranger to Pennsylvania. *See Vidal v. Girard's Executors,* 2 Howard 127, 43 U.S. 127, 11 L. Ed. 205 (1844).

Finally, the standard of Section 27 seems to us not to require legislative definition, however desirable such might be. Courts, which have attacked with gusto such indistinct concepts as due process, equal protection, unreasonable search and seizure, and cruel and unusual punishment, will surely not hesitate before such com-

paratively certain measures as clean air, pure water and natural, scenic, historic and esthetic values. The most uncertain of these, esthetic values, has been the subject of instant judicial recognition in the fields of planning and zoning.

If, as we have held, Article I, Section 27 has its own virtue, the Attorney General is plainly the proper officer to assert the public trust. *Commonwealth v. The Barnes Foundation*, 398 Pa. 458, 159 A. 2d 500 (1960).

The Commonwealth lost below, as we have noted, because the court found as ultimate fact that the tower would not injure the values protected by the constitution and concomitantly concluded that the Commonwealth had not borne its burden of proof. The Commonwealth contends here that the lower court's ultimate finding is not supported by the record and that the court erred by imposing upon the Commonwealth a heavier burden than that prescribed by law.

In reviewing findings and conclusions, we must first determine the scope of our review. We have had occasion to consider the matter very recently and repeat here what President Judge BOWMAN wrote in *Philadelphia Federation of Teachers, et al. v. William Ross, et al.*, 8 Pa. Commonwealth Ct. 204, 301 A. 2d 405 (1973).

". . . A multitude of authorities stands for the proposition that the scope of review in such a case is severely restricted. The most common expressions of this are couched in terms of 'manifest error,' 'clear abuse of discretion,' 'reasonable grounds,' et al. One of the earlier cases so stating was Steinmeyer v. Siebert, 190 Pa. 471, 42 A. 880 (1899), where the Court said that the findings of the chancellor will not be disturbed by the appellate court 'except for error which clearly appears. An apparent preponderance of testimony against [such findings] is not sufficient to lead to a reversal, if there

is testimony which if believed will warrant [the findings].' 190 Pa. at 475, 42 A. at 881. This position is now stated in 9 Standard Pennsylvania Practice, Ch. 40, §113. Similarly, in Commonwealth Trust Company, Admr. v. Szabo 391 Pa. 272, 276-77, 138 A. 2d 85, 87 (1957), the Court said that 'a chancellor's findings of fact, approved by a court en banc, have all the force and effect of a jury's verdict if they are supported by adequate evidence and ordinarily will not be disturbed on appeal: [citations omitted].' This was subject, however, to the limitation that the chancellor's ' "conclusions, whether of law or ultimate fact, are no more than his reasoning from the underlying facts and are reviewable," especially "where the underlying facts themselves are not in esse but are matter of inference and deduction": [citations omitted].' Accord, Shapiro v. Shapiro, 424 Pa. 120, 127, 224 A. 2d 164, 168 (1966).

"The narrow standard of 'manifest error' as to scope of review is stated in 9 Standard Pennsylvania Practice, Ch. 40, §113, with regard to findings in equity: 'Ordinarily, when the appellate court ascertains that the conclusions of fact reached by the trial court rest upon sufficient evidence and that the record discloses no manifest error in the deduction from the evidence, its duty in this respect has been fully discharged.

" 'The findings of fact of a chancellor . . . will not be disturbed on appeal, in the absence of clear error, if they are supported by adequate evidence or reasonable inferences therefrom. . . .' [Footnotes omitted.] Accord, Scientific Living, Inc. v. Hohensee, 440 Pa. 280, 270 A. 2d 216 (1970), cert. denied, 402 U.S. 1012 (1971), rehearing denied, 404 U.S. 874 (1971). This narrow standard is predicated on the chancellor's having had the opportunity to hear and observe witnesses.

"Concerning scope of review as to injunctions, 43 C.J.S. Injunctions, §14 states: 'The action of the court may be reviewed on appeal or error in case of a clear

abuse of discretion, but not otherwise. . . .' Accord, Stander v. Kelley, 432 Pa. 1, 246 A. 2d 649 (1968); Rick v. Cramp, 357 Pa. 83, 53 A. 2d 84 (1947); 5A C.J.S. Appeal & Error, §1591. This same standard has been adopted by the federal courts: United States v. Edwards, 333 F. 2d 575, 578 (5th Cir. 1964).

"This Court itself has had occasion to deal with the issue of appellate review vis-a-vis injunctions. In Armstrong School District v. Armstrong Education Association, 5 Pa. Commonwealth Ct. 378, 382, 291 A. 2d 120, 123 (1972), we said, 'In reviewing the lower court's action in issuing an injunction, our scope of review, as with other types of equity matters, is limited,' "[W]e will look only to see if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong or clearly inapplicable: . . . "[Citations omitted]." ' The 'reasonable grounds' criterion does not permit a broad scope of review.

"Thus, insofar as concerns a chancellor's findings of facts (not his inferences and deductions from facts not in esse), the law is clear that an appellate court can review these findings only where there has been manifest or clear error, a clear abuse of discretion, etc. Given sufficient evidence which justifies the findings and logically sound, reasonable inferences and conclusions derived therefrom, the chancellor's decision will stand. Even a preponderance of testimony against the findings will be insufficient if there is testimony which, if believed will warrant them. Steinmeyer, supra: 9 Standard Pennsylvania Practice, Ch. 40, §113. In summary, there must have been apparently reasonable grounds for the action of the lower court."

We have set forth in this opinion in paraphrase most of what is in this record. These facts and circumstances adequately support the court's findings both particular and conclusional. As was, of course, unavoidable, the Commonwealth's witnesses expressed not things immediately experienced by the senses but things of the intellect, spirit and taste. Admitting their superior knowledge in the fields of architecture, history, religion and park administration, we cannot accept their collective subjective judgments against the tower as a clear showing of an abuse of discretion by the court below without rejecting other evidence which plainly supplies reasonable grounds for the lower court's conclusion, such as the existing commercialism in the area, the agreement between the United States and the appellees providing for the tower at this site, the tower's usefulness as an aid to education, and a substantial local sentiment in favor of the project. Further, the Chancellor had the opportunity, not given us, of hearing and observing the witnesses. We find reasonable grounds for the court's action in the record.

The Commonwealth insists that the court below imposed upon it a heavier burden than the law provides. It bases this contention upon the court's statement at several places that the Commonwealth, as plaintiff in a suit for an injunction, carried the burden of proving irreparable harm. This statement of law, the Commonwealth argues, indicates that the court below erroneously required the plaintiff (1) to prove injury to the environment by clear and convincing evidence rather than by a mere preponderance of the evidence and (2) to prove *great* more than merely *some* injury to the environment.

The court indeed held that the plaintiff's burden was to prove its case by clear and convincing evidence. There is ample precedent that this is the proper standard in a case for an injunction. Typical versions of the

principle are: " '. . . equity will not grant injunctive relief in a doubtful case, and an injunction will be awarded only where the rights and the equity of the plaintiff are clear. . . .' " *Windber Borough v. Spadafora*, 356 Pa. 130, 134, 51 A. 2d 726 (1947). " 'The power of the courts to issue injunctions should be exercised with great caution and only where the reason and necessity therefor are clearly established.' . . ." *Rick v. Cramp*, 357 Pa. 83, 91, 53 A. 2d 84 (1947). "It lies on a party who asks for a decree, the effect of which, if granted, is to bind his adversary hand and foot, to make out a clear case, of at least preponderating equity. He has no case if his equity is doubtful. . . . He must make a case in which the chancellor may act with a good conscience. . . ." *Sparhawk v. The Union Passenger Railway Co.*, 54 Pa. 401, 426 (1867). "[E]quity will employ the strong arm of injunctive relief to restrain anticipated injury only when plaintiff's right thereto is clear, and irreparable harm is reasonably certain to result if the relief is not granted. [Citing cases.]" *Robinson v. Philadelphia*, 400 Pa. 80, 89, 161 A. 2d 1 (1960). Injunction is an extraordinary remedy. Where, as here, it is sought for the purpose of prohibiting a use of land not prohibited by description, but on grounds as amorphous as its asserted injury of historic and esthetic values of the environment, equity properly requires clear and convincing proofs.

The Commonwealth also asserts that the Chancellor's use of the phrase "irreparable harm" erroneously required it to show more than *some* injury to the values entitled to preservation by Article I, Section 27. It contends that the court thereby imposed the burden of proving *great* injury. First, the argument assumes that the court below found *some* harm; we find nothing in the court's several opinions indicating that it found that the tower would inflict *any* harm. Further, we cannot construe Article I, Section 27 as removing equi-

ty's immemorial duty to weigh in its conscience the effect upon the defendant of a decree, even where the plaintiff's right has been established. *Moyerman v. Glanzberg*, 391 Pa. 387, 138 A. 2d 681 (1958). It is difficult to conceive of any human activity that does not in some degree impair the natural, scenic and esthetic values of any environment. If the standard of injury to historic values is to be that expressed by the Commonwealth's witnesses as an "intrusion" or "distraction," it becomes difficult to imagine any activity in the vicinity of Gettysburg which would not unconstitutionally harm its historic values. This, of course, indicates why elements of State government other than the judiciary should, as by Article I, Section 27 they are empowered to do, establish reasonable regulations for the preservation, conservation and maintenance of the peoples' resources.

The earnest briefs filed in this matter, including those of the several amici curiae, have been most edifying and helpful in our considerations.

Order affirmed.

CONCURRING OPINION BY PRESIDENT JUDGE BOWMAN:

I fully concur with the result reached by the majority in the disposition of this appeal. In my opinion, however, it was not necessary for this Court, in affirming the lower court, to reach and decide the difficult and extremely important question of whether or not the provisions of Article I, Section 27, are self-executing.

As the majority so pertinently points out, "[i]t is difficult to conceive of any human activity that does not in some degree impair the natural, scenic and esthetic values of any environment." If this is so—and quite apart from the matter of proof of impairment—the ramifications of declaring these rights to be self-executing are manifold.

"[T]he general, great and essential principles of liberty and free government" historically recognized and established in Article I, the Declaration of Rights, of our present and past Constitutions are protection against a government which might otherwise abridge or destroy these fundamental rights. That these fundamental rights and guarantees are self-executing against an over-reaching government cannot be gainsaid. We are now confronted, however, with a new constitutional provision which confers enumerated rights upon the people, not as a protection against governmental infringement, but against their fellow citizens and the due process rights of their fellow citizens.

An untrodden and difficult path of judicial interpretation of a new and novel constitutional provision faces us. I would not here take the first step as I believe it to be unnecessary in disposition of this appeal.

---

CONCURRING AND DISSENTING OPINION BY JUDGE MENCER:

I concur in the result reached in this case. However, I must respectfully dissent from that portion of the opinion that holds that Article I, Section 27 of the Pennsylvania Constitution is self-executing. Much could be written about this question and, I have no doubt, will be, but for now I consider it sufficient to join in the following concise and provocative observations concerning this section, written by Judge SILVESTRI in ruling on preliminary objections in the case of *Commonwealth of Pennsylvania and Allegheny County v. United States Steel Corporation*, at No. 1550 April Term, 1972, in the Court of Common Pleas of Allegheny County:

"Constitutional provisions are not self-executing if they merely indicate a line of policy or principles without supplying the means by which such policy or principles are to be carried into effect; or if the language

is directed to the legislature or the Courts, or if it appears from the language used and circumstances of its adoption that subsequent legislation was contemplated to carry it into effect. To be self-executing the provision must indicate that it is intended as a present enactment, complete in itself and definitive legislation. 16 C.J.S. Constitutional Law, Sec. 48, p. 145, 146.

"In I Cooley's Constitutional Limitations at pages 167-168, it is stated that 'A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law.' And at page 165, '. . . while the purpose may be to establish rights or to impose duties, they do not in and of themselves constitute a sufficient rule by means of which such right may be protected or such duty enforced. In such cases, before the Constitutional provision can be made effectual, supplemental legislation must be had; . . .;' all of which requires a consideration of the language used and of the intrinsic nature of the provision itself.

"From the cases, treatises and the encyclopedias the following tests are to be used to ascertain whether or not a constitutional provision is self-executing:

"a. does it announce a policy or a principle;

"b. does the language direct action be taken by the Courts or the legislature;

"c. is it a present enactment, complete in itself and definitive legislation;

"d. the intrinsic nature of the provision; and

"e. the language of the provision.

. . .

"The entire first sentence of the amendment enunciates a right of the people not only to clean air and

water but also to the preservation of the environment. The second sentence establishes that the natural resources belong in common to all the people and generations yet to come. The third sentence makes the Commonwealth the trustee of these natural resources and imposes a duty upon it to conserve and maintain them for the benefit of all the people.

"The provision as written is unquestionably a declaration of principle and policy as to how the people of the Commonwealth view the environment and its ownership. The provisions clearly, not only creates a right in the people but also imposes a duty, as trustee, upon the Commonwealth; however, there is no language directed either to the Courts or to the legislature relative to the policy stated or the right created and the duty imposed.

"Turning to the specific language of the amendment, it speaks of 'pure water.' What is pure water? Must water be pure in all areas of human, animal, agricultural, industrial or commercial use? Must water in our lakes, streams and rivers which are used for commerce and pleasure be 'pure water'? Must the use of additives, such as 'fluoridation,' be discontinued? Must all water, however used, be first distilled and then treated to remove all matters leaving only two atoms of hydrogen and one atom of oxygen joined together? What is pure water?

"As to 'natural, scenic, historic and esthetic values of the environment,' what does the phrase mean or each word mean?

"If 'natural' refers to 'nature' are we to let it proceed without intervention in regard to floods, drought and other damaging vagaries of the elements?

"Beauty is in the eye of the beholder—what eye is to determine what is 'scenic'?

"History is what historians have catalogued of the past. Obviously the provision does not refer to written

history but rather to things, buildings, sites and places. Are they never to give way or be relocated to the expanding community and its needs?

"Is there a common 'esthetic value' which is apparent? What is beauty? Is it the same for all people and for generations yet to come?

"What is clean air? Science tells us that air is made up of the following, exclusive of water vapor:

| | |
|---|---|
| Nitrogen | 78.084% |
| Oxygen | 20.946% |
| Carbon Dioxide | 0.033% |
| Argon | 0.934% |
| **Total** | 99.997% |

"The balance of 0.003% consists of neon, helium, krypton, xenon, hydrogen, ozone, nitrous oxide and methane.

" 'Clean air' means free from dirt, pollution, contamination, disease or any admixture. Stated another way clean air means air containing only the elements and compounds set forth above plus water vapor which also has to be pure.

"Human, animal and plant life has subsisted, perhaps not as well as it could have, in our complex industrial society with other elements, compounds and mixtures in the air. What is clean air? Is it something better than exists in our present environment or something other than the foregoing mixture?

"[All] of the foregoing questions and many others which a fertile mind, legal and otherwise, may conjure are left unanswered by the foregoing constitutional provision. To leave it to the Commonwealth to initially determine the answers and then bring legal action would be a grant of unlimited and uncontrolled power with obvious dangers. . . .

"In view of the intrinsic nature of the amendment and the language by which it is expressed, it is not complete and definitive legislation and is therefore not self-executing."