**Fairchild v. Schomp**

*Joel H. Ziev,* for plaintiffs.

*Nicholas Noel, III* and *Mark S. Sigmon,* for defendants.

VAN ANTWERPEN, *J.,* August 31, 1982—Plaintiffs seek damages and an injunction in this equity matter directing removal of a certain gingko tree on defendants' property which allegedly deposits malodorous pods on plaintiffs' property each autumn. From the hearings held on August 17 and 18, 1982, we make the following

## FINDINGS OF FACT

1. Plaintiffs, Alvin L. and Mary K. Fairchild, reside at 123 Parsons Street in the city of Easton, Northampton County, Pa. They own title to their home and have resided at this address since August, 1975.

2. Defendants, David E. and Jacquelyn Schomp, reside at 401 High Street in the city of Easton, Northampton County, Pa. Since 1977, they have owned title to rental apartments at 129 Parsons Street, Easton, Northampton County, Pa. This leased premises adjoins plaintiffs' premises.

3. On defendants' premises on Parsons Street there is a 70 foot tall famale gingko biloba tree in the front yard. The tree has two main branches, one

of which leans toward and extends over plaintiffs' property.

4. Lorraine Mineo possesses a Master's Degree in Botany, and experience in numerous commercial and research botanical situations. She is curently a lecturer at Lafayette College in botany. The course work includes gingko trees. At the request of plaintiffs, she examined the gingko tree on defendants' property, and from its 20 inch diameter, concludes that the tree is about 75 years old.

5. The gingko tree is a gymnosperm tree and is the last surviving species of a whole range of prehistoric trees. Today's usage is primarily for shade purposes. It is the oldest living kind of tree on earth, and is divided into male and female of the species. The male trees have a cone structure, and the females have seeds which grow to the size of sugar plums. The female life cycle begins on the tree and finishes on the ground. The seeds or pods usually emit a strong odor, similar to rancid butter, and can be blown about by the wind. Gingko trees can exist in much of the climate of the United States but do not grow here naturally in a wild state. They are an import from China where they were revered as temple trees.

6. The trade custom is to sell and plant only male trees because they have no malodorous pods or seeds. The fermentation of the female seeds can vary in soil conditions from place to place and can be very putrid or foul. Temperature, moisture, rainfall, and humidity can also effect the fermentation rate and length. Most female trees are removed in our culture because of problems with the seeds. Mere sweeping up of the pods is usually not fully sufficient.

7. Aside from removal, Lorraine Mineo knows of no certain way to prevent the nearby male trees

from fertilizing the female and causing pod production. Pruning would result in overall increased seed production in the long term. Malic hydrazide, a plant growth inhibitor, is sometimes successful when sprayed on the female. There are environmental dangers to this chemical in the soil and constraints as to its method of application. Other chemical sprays are not recommended for use on gingko trees. She would recommend removal of the tree in question.

8. The 1952 City of Easton Zoning Ordinance does expressly permit the planting of gingko trees for shade purposes. The ordinance does not specify the sex of the trees: City of Easton Zoning Ordinance 1356, §1, passed 4-15-52, Sec. 907.08(c).

9. Plaintiff Alvin Fairchild testified that in 1975, when his family first moved in, pods fell in October to the end of December. He complained in 1975 and the years following to the owners of the adjoining property but nothing was done. Over the course of the next 5 years, the quantity of pods has gradually increased, and each autumn for 3 months, he and his wife must rake up the pods which fall and blow upon their property. It takes approximately a half hour to rake up the pods. The odor is similar to vomit and excrement and the pods stain the walkway. Portions are sometimes tracked in the home. The pods draw flies, and render the front yard unusable in the fall, according to plaintiffs.

10. On cross-examination, plaintiff, Alvin Fairchild, admitted that his father was for many years a tree surgeon and that he had substantial experience assisting his father in this calling. He also stated that in seasons other than autumn, the pods also fall to some extent and are removed by both plaintiffs without substantial difficulty.

11. Mariellen Reilly and Annmarie Kuhs, friends

of plaintiff Mary Fairchild, corroborated much of Mr. Fairchild's testimony about the pods, and described the odor as strong and similar to "dog dirt." Gail Glazer and Patricia Pursell, sisters of plaintiff Mary Fairchild, described the problem of avoiding the pods and cleaning shoes when entering or leaving the Fairchild home.

12. Plaintiff, Mary Fairchild, testified that when they bought their home in 1975, the realtor told them that there was a gingko tree next door. She was not familiar with female gingko trees and did not anticipate any problems. She recounted experiences similar to those of Mr. Fairchild, and the dread and apprehension of the family each fall.

13. Defendant, David E. Schomp, Jr., testified that none of his tenants on Parsons Street have ever complained about the tree or the pods. He stated that twice weekly he and his wife clean up the pods and other leaves about the Parsons Street property without help from others.

14. Mr. Schomp identified an old postcard which is labeled A.D. 1924 and shows the tree in question to be about eight feet tall. He also testified that there is a dog problem in the neighborhood and that it produces odors which often become mixed or confused with the gingko tree pods. He agrees that the pods smell like dog feces.

15. Defendant, Jacquelyn Schomp, testified that she assists her husband in cleaning up the pods, and last fall when doing so, brought her three and a half year old daughter with her. She says the process takes approximately a half hour and eliminates the odor problem. The picked up pods would fill one third of a 20 gallon garbage can.

16. Ila B. Hahn testified that she has managed or been present on or owned defendants' Parsons Street premises from 1940 through 1977. She states

that in 1945, the tree was well over the roof top in height and that the pods do have a "dog matter" odor, but that when she picked up the pods every two to four days, there was no odor problem. The clean up process from 1972 to 1977 took less than one hour to clean up the yards of 129 and 123 Parsons Street. She took part in the sale of 123 Parsons Street at which time plaintiff Alvin Fairchild's father told her, in his son's presence, about his complete familiarity with the gingko tree. He did not indicate the sex of the tree.

## DISCUSSION

This case concerns a female gingko tree on property which adjoins that of plaintiffs. For several months each autumn, the tree and wind deposit foul smelling pods on plaintiffs' property, and plaintiffs seek an injunction ordering removal of the tree as a nuisance. Although an exhaustive search for a reported case on point has not borne fruit, we are convinced that the gingko tree in question does not constitute a truly natural condition of land for which no liability for private nuisance can attach. See Restatement, 2d, Torts, §840; see also, Marzacco v. Crossley, 30 D. & C. 2d 98 (1963) (overhanging tree branches causing damage to a neighbor's property found to constitute a nuisance); Oyster v. Levy, 391 Equity Docket (C. P. Northumberland 1916) (willow tree infested with bugs found to be a nuisance). The gingko tree was originally imported from China and it is clear that the species of tree in question does not naturally grow in this area in a wild state. The following illustration contained in the Comments to §840 of the Restatement, Torts 2d is particularly instructive in this regard:

4. A purchases and takes possession of land on

which have been planted a number of eucalyptus trees near the boundary line of B's land. The roots of the eucalyptus trees grow into B's land, with the result that walnut trees growing thereon are stunted and otherwise damaged. . . . (T)he eucalyptus trees are not a natural condition.

See also, Coates v. Chinn, 51 Cal. 2d 304, 332 P. 2d 289 (1958).

A private nuisance has been defined as the "unreasonable, unwarrantable or unlawful use of property by a person which causes injury, damage, hurt, inconvenience, annoyance or discomfort to one in the legitimate enjoyment of his property." Smith v. Alderson, 262 Pa. Superior Ct. 387, 396 A. 2d 808 (1979). However, the invasion of another's interest must be substantial and unreasonable in order to justify the awarding of damages or injunctive relief: Folmar v. Elliott Coal Mining Co., 441 Pa. 592, 272 A. 2d 910, 912 (1971); Waschak v. Moffat, 379 Pa. 441, 109 A. 2d 310 (1954); Restatement, 2d, Torts, §822.

In an equity matter such as this, the granting or denial of the relief requested rests within the sound discretion of the chancellor: Richard v. Weiser, 329 Pa. 203, 198 Atl. 29 (1938).

We find that while the falling pods have caused some annoyance and inconvenience to plaintiffs for several weeks each year, we are unable to conclude that the tree in question results in such a material and substantial invasion of plaintiffs' rights so as to constitute a legal nuisance. As emphasized by our Supreme Court in Young v. St. Martin's Church, 361 Pa. 505, 509, 64 A. 2d 814 (1949), "(I)t is a far cry from what is merely an annoyance or disagreeable intrusion to what the law regards and condemns as a nuisance." See also, Essick v. Shillam,

347 Pa. 373, 32 A. 2d 416 (1943). In this regard, we must consider the fact that there is no evidence that any of defendants' tenants at 129 Parsons Street have complained about the odor, nor did any of them testify in court.

Nor are we convinced that Oyster v. Levy, supra, requires a different result. The finding of nuisance in that case is distinguishable in that the tree in question was infested with insects and produced a more severe and material invasion of the plaintiff's interests.

Our search for case authority has yielded a case from Illinois: Merriam v. McConnell, 3 Ill. App. 2d 492, 175 NE. 2d 293 (1961) in which an injunction was sought to remove certain box elder trees which annually caused an invasion of adjoining property with bugs. While we believe these trees might not be a truly natural condition, we are nevertheless struck by the language of the court in denying relief at page 297:

We think that (granting) the decree before us would probably expose property owners, especially in wooded suburban areas, to much vexation. And, it might result in adding the weight of "clothes-line" disputes, which ought to be settled amicably by neighbors, to the mounting burden of law suits now impeding the administration of justice.

Furthermore, while we are unable to conclude that plaintiffs had actual notice of the tree's propensities at the time they purchased the property, we do note that there is evidence that plaintiffs were aware that there was a gingko tree on the boundary line between the properties, yet chose to purchase the property without making further inquiries about the tree. See, Weishner v. Washington

County Golf and Country Club, 11 D. & C. 3d 458 (1979). This is particularly noteworthy in light of the evidence that plaintiff Alvin Fairchild's father, who was a tree surgeon for many years, discussed with him the fact that the tree in question was a gingko tree, and plaintiff himself has had substantial experience assisting in his father's business.

The courts cannot resolve all the ills of mankind. If they could, there would be no need for the various professions or other branches of government. Under the circumstances, we resolve to leave well enough alone.

## CONCLUSIONS OF LAW

1. The gingko tree on defendants' property does not constitute a natural condition of land so as to insulate defendants from liability for any damage caused thereby.

2. The interference with plaintiffs' use and enjoyment of their property which is caused by the tree in question is not so substantial and unreasonable as to entitle plaintiffs to the relief requested.

Wherefore, we enter the following

## DECREE NISI

And now, August 31, 1982, in accordance with the foregoing adjudication, it is ordered, adjudged, and decreed that the relief prayed for in plaintiffs' complaint is denied.

The prothonotary shall give notice to counsel for the parties of the entry of this decree nisi and if no exceptions are taken within ten days, this decree nisi shall become a final decree.